**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| HAROLD M. LEVY and MICHAEL K. SURPRENANT, | Case No. |
| Plaintiffs, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| AARON JAGDFELD, YORK A. RAGEN, MARCIA J. AVEDON, ROBERT D. DIXON, WILLIAM JENKINS, ANDREW LAMPEREUR, BENNETT MORGAN, NAM T. NGUYEN, DAVID A. RAMON, KATHRYN ROEDEL, JOHN D. BOWLIN, and DOMINICK ZARCONE, | <u>JURY TRIAL DEMANDED</u> |
| Defendants, | |
| and | |
| GENERAC HOLDINGS INC., | |
| Nominal Defendant. | |

Plaintiffs Harold M. Levy ("Levy") and Michael K. Surprenant ("Surprenant") (together, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Generac Holdings Inc. ("Generac" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the Individual Defendants' (defined herein) non-exculpable breaches of fiduciary duties and unjust enrichment.

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Generac with

the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, review and analysis of court filings in the related consumer class action lawsuit and the related securities class action lawsuit alleging violations of federal securities laws which are both based on similar facts and circumstances alleged herein, and currently pending in the U.S. District Court for the Eastern District of Wisconsin styled *See In re: Generac Solar Power Systems Marketing Sales Practices and Products Liability Litigation.*, Docket No. 2:23-md-03078 (E.D. Wis.) ("the Consumer Action") and *Oakland Cnty. Voluntary Emps'. Beneficiary Assoc. v. Generac Holdings Inc., et al.,* No. 2:22-cv-1436-BHL (E.D. Wis.) ("the Securities Action"), respectively.

## I.  NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Generac against the Individual Defendants based on their non-exculpable breaches of fiduciary duty and other serious misconduct alleged in detail herein between at least April 29, 2021 through November 1, 2022 (the "Relevant Period"), including the issuance of a series of materially false and misleading statements. In addition to other damages, the Individual Defendants' misconduct has exposed the Company to substantial liability and defense costs in connection with the Consumer Action and the Securities Action, as set forth below.

2.      Generac is based in Waukesha, Wisconsin, and designs, manufactures, and markets various forms of residential, commercial, and industrial power systems. Generac's products include generators, portable generators, light towers, pressure washers, and solar panels, among other things.

3.      Generac sells, services, and installs its products through a network of independent dealers, retailers, and wholesalers known as "channel partners." The Company classifies its products into three categories based on similar range of power output geared for varying end

customer uses: Residential products, Commercial & Industrial (C&I) products and Other products & services.

4.      In April 2019, Generac entered the residential clean energy market by acquiring Pika Energy, Inc. ("Pika"), a battery storage manufacturer that designs products intended to catch and hold solar power for homes. Generac's Channel Partners in the solar battery storage sector include Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy"), Baker Electric Home Energy, Posigen, and Valley Solar. During the Relevant Period, Pink Energy operated across fifteen States, making it Generac's biggest channel partner.

5.      Prior to the Relevant Period, Generac experienced an unprecedented increase in generator demand and sales due to "shelter-in-place" orders issued in early 2020 in response to the COVID-19 pandemic. The demand surge caused by COVID-19 not only provided a boost to Generac, but also the dealers, as their revenue increased from skyrocketing customer contracts and installations. However, Generac's dealer count did not grow as fast as Generac's generator sales. For example, Generac's Residential[1] sales grew by 110% from the first quarter ("1Q") 2020 to 1Q 2021, and shipments to dealers "more than doubled," but Generac's total number of dealers only grew by 18% in that time.

6.      However, at around the same time the Company's short-term spike in generator sales from COVID-19 was failing to sustain itself, Generac suffered a massive setback in its solar business, as its products suffered from a dangerous defect. Specifically, Generac's products utilized a safety device known as "SnapRS" which connected one solar panel to another. This "SnapRS" device was designed to allow homeowners or first responders to rapidly shut down solar

---

[1] Generac reports its revenue in segments based on the end customer use – i.e., "Residential," "Commercial and Industrial," and "Other." Thus, Residential includes home standby ("HSB") generators, solar and energy storage products, portable generators, and other residential-use products.

systems in dangerous situations, such as when firefighters needed access to a roof equipped with electrified solar panels. However, customer complaints began skyrocketing because the SnapRS had an unreasonably high defective rate, as it would overheat, melt, and even, in some cases, start fires. This defect led to tens of thousands of customer complaints and dealer service calls, resulting in mounting warranty and liability claims. In response, Generac sought to buy time by implementing a variety of temporary, and ultimately unsuccessful fixes that only increased the complaints, service calls, and warranty and liability claims.

7.     Although SnapRS's defects were known within the Company as early as April 2021, on the Individual Defendants' watch, Generac neglected to notify its channel partners, consumers, and stockholders of SnapRS's defects, instead continuing to manufacture, market, and sell SnapRS switches in the Company's residential solar energy systems.

8.     Rather than warning channel partners, consumers, and stockholders of the defects, on the Individual Defendants' watch, Generac continued to publicly praise the quality and reliability of the Company's residential solar energy systems while simultaneously making minor clandestine modifications to SnapRS switches, including issuing a firmware update. When the minor modifications failed to remedy SnapRS's infirmities, the Individual Defendants continued to mislead stockholders, channel partners, and consumers about the safety and quality of the Company's residential solar energy systems. Pursuant to Accounting Standards Codification 460 of Generally Accepted Accounting Principles ("GAAP"), the Company was required to book warranty liability as soon as the Company could approximate the likely cost of its liability. Despite knowing about the issues with SnapRS switches, on the Individual Defendants' watch the Company failed to disclose any increased liability in connection.

9.      During the Relevant Period, the Individual Defendants made materially false and misleading statements about the Company's business practices, compliance policies, and future prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to stockholders which failed to disclose that: (1) the SnapRS defect plaguing the Company was known of within Generac; (2) as a result, the Company's largest Channel Partner, Pink Energy, faced significant liability and eventual bankruptcy; (3) due to the foregoing, Generac misrepresented its warranty liability; (4) consequently, Generac overstated its earnings throughout the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.

10.      The truth began to emerge when Pink Energy, Generac's largest Channel Partner, filed a lawsuit against Generac in the U.S. District Court for the Western District of North Carolina on August 1, 2022 (the "Pink Energy Action"). The Pink Energy Action revealed that Generac's SnapRS switches were "defective," thereby causing millions of dollars in damage and putting Pink Energy's solvency in severe jeopardy.

11.      On this news, the price per share of Generac stock fell by $3.31 from the previous day's closing price of $268.30, closing at $264.99 on August 1, 2022. Thereafter, numerous customer complaints about Generac's defective and dangerous product were lodged with various state Attorneys General and regulatory agencies. Nonetheless, under the Individual Defendants' direction and on their watch, the Company did not issue any recalls or adjust its safety disclosures and warnings to protect consumers.

12. On October 7, 2022, Pink Energy filed for bankruptcy and the Company's financial reports reflected a significant downturn in Generac's earnings, causing a further decline in the Company's stock price.

13. Finally, not only was Generac exposed to undisclosed risk and losses as a result of the SnapRS defect; the Company was also exposed to substantial risks from its high concentration of an estimated more than half its solar product sales in a single dealer, Pink Energy. Concentration of sales is a well understood business risk because if a company relies on one dealer for an outsized portion of its sales, the loss of that dealer (including from ceasing operations), would have a disproportionate impact on the sales of the company. Here, the Company's concentration risk was exacerbated by both Pink Energy's negative reputation for predatory sales practices that drew attention from investigative reporters and regulators and by the fact that as an outsized solar dealer, Pink Energy was particularly vulnerable to the risks and liabilities of the SnapRS defect.

14. The true facts regarding Generac's over-reliance on Pink Energy were ultimately revealed through a series of negative disclosures, including Generac slashing its solar revenue guidance once Pink Energy went out of business.

15. When the truth regarding the SnapRS defects began to emerge through a series of disclosures, the Company's stock price collapsed. The revelation of Generac's dependence on Pink Energy also contributed to Generac's stock price declining precipitously.

16. In breach of their non-exculpable fiduciary duties, the Individual Defendants made and/or caused the Company to make materially false and misleading statements to stockholders, engage in the underlying SnapRS misconduct and fail to maintain adequate internal controls during the Relevant Period.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct, and/or causing the Company to fail to correct, these false and misleading statements and omissions of material fact to stockholders, while, during the Relevant Period, defendants Aaron Jagdfeld ("Jagdfeld") and York A. Ragen ("Ragen") sold personally-held Company shares at artificially inflated prices for proceeds totaling over $40 million.

18.     On November 22, 2022, the state Attorneys General of Kentucky, North Carolina, Illinois, Indiana, Michigan, Pennsylvania, South Carolina, Tennessee, and Virginia sent a joint letter to companies that provided financing for consumer purchases of solar power systems from Pink Energy. The letter asks for a suspension of repayments for non-working systems.

19.     The Individual Defendants' misconduct has significantly harmed Generac. As a result of this misconduct, multiple consumer class actions have been brought against the Company, consolidated as the Consumer Action. The Eastern District of Wisconsin denied Generac's motion to dismiss the Consumer Action on May 24, 2024.

20.     Further, numerous securities fraud class action lawsuits have been brought against the Company and defendants Jagdfeld and Ragen regarding substantially the same underlying misconduct alleged in the sustained Consumer Action.  Those cases have been consolidated as the Securities Action.

21.     The pending Securities Action alleges violations of federal securities laws and is brought on behalf of a "class" of persons and entities that purchased or otherwise acquired Generac common stock between April 29, 2021 and November 1, 2022.

22.     Efforts to avoid liability for this serious wrongdoing continue through the present, as the Demand Defendants (defined herein), who comprise Generac's current Board, have acted in bad faith by constructively and wrongfully refusing Plaintiffs' pre-suit demand to independently

investigate and institute this litigation for the benefit of the Company (the "Litigation Demand"). A true and correct copy of the Litigation Demand is attached hereto as Exhibit 1.

23.     On July 18, 2023, the Litigation Demand was served on the Board, demanding that the Board promptly undertake a reasonable, independent investigation in good faith and take action on behalf of Generac to remedy the harm to the Company caused by the serious misconduct described therein.

24.     Well over a year has passed since the Litigation Demand was sent to the Board, and yet the Board has undertaken none of the items demanded in the Litigation Demand. Meanwhile, the Company has continued to incur damages and remains exposed to further damages. At this point, nearly 17 months since the Litigation Demand was served on the Board, it is clear that the Board intends to never meaningfully consider the Litigation Demand, instead burying its head in the sand and hoping Plaintiffs will just sit idle or eventually go away.

25.     The only possible basis for the Board's indefinite deferral of the Litigation Demand is that the Board determined to reject the Litigation Demand from the outset in bad faith and in breach of its fiduciary duties. Because the Board has constructively, wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company's interests, rectify the wrongs detailed in the Litigation Demand and herein, and hold the wrongdoers accountable for the damages they caused Generac and/or have exposed Generac to.

26.     Stockholders are entitled to honest and accurate information from Generac's directors and officers. The Individual Defendants fell far short of meeting their non-exculpable fiduciary obligations of loyalty and good faith to the Company and its stockholders, giving rise to the Litigation Demand and this derivative action. Accordingly, Plaintiffs seek to recover for the

Company damages caused to Generac by the Individual Defendants' non-exculpable breaches of fiduciary duties.

## II.      JURISDICTION AND VENUE

27.      This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332. Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and the named Plaintiffs and Defendants are citizens of different states.

28.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

29.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.      PARTIES

### Plaintiffs

30.      Plaintiff Levy is a current holder of Generac common stock and has continuously held Generac common stock at all relevant times.  Plaintiff Levy is a citizen of Maryland.

31.      Plaintiff Surprenant is a current holder of Generac common stock and has continuously held Generac common stock at all relevant times.  Plaintiff Surprenant is a citizen of Michigan.

### Nominal Defendant

32.      Nominal Defendant Generac is a Delaware corporation with its principal executive offices located at S45 W29290 Hwy 59, Waukesha, Wisconsin. Generac's common stock is traded

on the New York Stock Exchange ("NYSE") under the ticker symbol "GNRC." Defendant Generac is a citizen of Delaware and Wisconsin.

**Individual Defendants**

33. Defendant Jagdfeld has served as the Company's Chief Executive Officer ("CEO") and President since September 2008 and as a Company director since November 2006. Defendant Jagdfeld has been Chairman of the Board since 2016. Previously, Defendant Jagdfeld served as Chief Financial Officer ("CFO") of Generac from 2002 to 2006. Upon information and belief, Defendant Jagdfeld is a citizen of Wisconsin.

34. During the Relevant Period, while the Company's stock price was artificially inflated and before the Individual Defendants' scheme was exposed, Defendant Jagdfeld made the following sales of Company stock:

| Date | Shares Sold | Price | Profit |
|---|---|---|---|
| May 3, 2021 | 1101 | $325.7361 | $358,635.45 |
| | 1182 | $322.4043 | $381,081.88 |
| | 1212 | $323.3704 | $391,924.92 |
| | 1505 | $324.383 | $488,196.42 |
| June 1, 2021 | 400 | $333.245 | $133,298.00 |
| | 457 | $332.1418 | $151,788.80 |
| | 544 | $329.0362 | $178,995.69 |
| | 935 | $330.2798 | $308,811.61 |
| | 2664 | $331.4516 | $882,987.06 |
| July 1, 2021 | 1325 | $413.044 | $547,283.30 |
| | 1493 | $412.3671 | $615,664.08 |
| | 2182 | $414.0182 | $903,387.71 |
| August 2, 2021 | 100 | $418.01 | $41,801.00 |
| | 200 | $415.55 | $83,110.00 |
| | 300 | $414.0889 | $124,226.67 |
| | 393 | $419.3444 | $164,802.35 |
| | 700 | $412.90 | $289,030.00 |
| | 700 | $411.9036 | $288,332.52 |
| | 900 | $416.46 | $374,816.34 |
| | 1707 | $421.3186 | $719,190.85 |

| | | | |
|---|---|---|---|
| September 1, 2021 | 510 | $439.39 | $224,088.90 |
| | 985 | $437.89 | $431,321.65 |
| | 1590 | $440.43 | $700,283.70 |
| | 1915 | $436.73 | $836,337.95 |
| October 1, 2021 | 100 | $406.90 | $40,690.00 |
| | 300 | $408.67 | $122,601.00 |
| | 300 | $404.59 | $121,377.00 |
| | 577 | $403.00 | $232,531.00 |
| | 1227 | $402.35 | $493,683.45 |
| | 2496 | $401.35 | $1,001,769.60 |
| November 1, 2021 | 400 | $496.85 | $198,740.00 |
| | 500 | $498.14 | $249,070.00 |
| | 709 | $500.01 | $354,507.09 |
| | 1091 | $499.11 | $544,529.01 |
| | 1150 | $495.21 | $569,491.50 |
| | 1150 | $494.28 | $568,422.00 |
| December 1, 2021 | 100 | $427.22 | $42,722.00 |
| | 300 | $425.67 | $127,701.00 |
| | 516 | $422.13 | $217,819.08 |
| | 585 | $419.24 | $245,255.40 |
| | 670 | $421.20 | $282,204.00 |
| | 947 | $424.32 | $401,831.04 |
| | 1882 | $423.42 | $796,876.44 |
| January 3, 2022 | 198 | $349.90 | $69,280.20 |
| | 214 | $346.43 | $74,136.02 |
| | 274 | $350.86 | $96,135.64 |
| | 282 | $351.94 | $99,247.08 |
| | 316 | $348.49 | $110,122.84 |
| | 465 | $344.57 | $160,225.05 |
| | 484 | $347.49 | $168,185.16 |
| | 521 | $345.93 | $180,229.53 |
| | 2246 | $353.93 | $794,926.78 |
| February 1, 2022 | 2192 | $282.96 | $620,248.32 |
| | 2802 | $284.05 | $795,908.10 |
| | 3232 | $280.08 | $905,218.56 |
| | 5000 | $286.29 | $1,431,450.00 |
| | 10615 | $281.16 | $2,984,513.40 |
| | 11053 | $282.16 | $3,118,714.48 |
| March 1, 2022 | 5000 | $314.49 | $1,572,450.00 |
| April 1, 2022 | 5000 | $298.74 | $1,493,700.00 |
| May 2, 2022 | 5000 | $218.70 | $1,093,500.00 |
| June 1, 2022 | 5000 | $250.68 | $1,253,400.00 |
| July 1, 2022 | 5000 | $213.81 | $1,069,050.00 |

| | | | |
|---|---|---|---|
| August 1, 2022 | 5000 | $264.96 | $1,324,800.00 |
| September 1, 2022 | 5000 | $216.36 | $1,081,800.00 |
| October 3, 2022 | 5000 | $179.90 | $899,500.00 |
| November 1, 2022 | 5000 | $119.05 | $595,250.00 |

| | |
|---|---|
| **Total Shares Sold** | **124,894** |
| **Gross Sale Proceeds** | **$38,223,208.62** |

35. Thus, in total, before the Individual Defendants' misconduct was exposed, Jagdfeld sold nearly 125,000 shares of Company stock on inside information, for which he received approximately over $38 million in proceeds. His insider sales, made with knowledge of material non-public information ("MNPI") before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

36. Defendant Ragen joined Generac in 2005 and has served as the Company's CFO since September 2008. Upon information and belief, defendant Ragen is a citizen of Wisconsin.

37. During the Relevant Period, while the Company's stock price was artificially inflated and before the Individual Defendants' scheme was exposed, Defendant Ragen made the following sales of Company stock:

| Date | Shares Sold | Price | Profit |
|---|---|---|---|
| November 11, 2021 | 991 | $441.38 | $437,407.58 |
| | 2328 | $443.27 | $1,031,932.56 |
| | 6681 | $442.59 | $2,956,943.79 |

| | |
|---|---|
| **Total Shares Sold** | **10,000** |
| **Gross Sale Proceeds** | **$4,426,283.93** |

38. Defendant Marcia J. Avedon ("Avedon") has served as a Company director since December 2019. Defendant Avedon serves as a member of the Demand Review Committee (the "DRC").[2] She also currently serves as a member of the Nominating and Corporate Governance

---

[2] The DRC is a committee of the Board tasked with reviewing the Litigation Demand.

Committee and chair of the Human Capital and Compensation Committee ("Compensation Committee"). Upon information and belief, Defendant Avedon is a citizen of North Carolina.

39.     Defendant Robert D. Dixon ("Dixon") has served as a Company director since March 2012. Defendant Dixon serves as a member of the DRC. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Upon information and belief, Defendant Dixon is a citizen of Pennsylvania.

40.     Defendant William Jenkins ("Jenkins") has served as a Company director since March 2017. He also serves as a member of the Compensation Committee.   Upon information and belief, Defendant Jenkins is a citizen of California.

41.     Defendant Andrew G. Lampereur ("Lampereur") has served as a Company director since March 2014. Defendant Lampereur serves as a member of the DRC. He also serves as the chair of the Audit Committee.  Upon information and belief, Defendant Lampereur is a citizen of Wisconsin.

42.     Defendant Bennett Morgan ("Morgan") has served as the Company's Lead Director since February 2018 and as a Company director since November 2013. Defendant Morgan serves as a member of the DRC. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.   Upon information and belief, Defendant Morgan is a citizen of Minnesota.

43.     Defendant Nam T. Nguyen ("Nguyen") has served as a Company director since March 2022. She also serves as a member of the Nominating and Corporate Governance Committee.  Upon information and belief, Defendant Nguyen is a citizen of California.

44.     Defendant David A. Ramon ("Ramon") has served as a Company director since April 2010. He also serves as a member of the Nominating and Corporate Governance Committee

and as a member of the Audit Committee. Upon information and belief, Defendant Ramon is a citizen of Georgia

45. Defendant Kathryn Roedel ("Roedel") has served as a Company director since December 2016. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Upon information and belief, Defendant Roedel is a citizen of Minnesota.

46. Defendant John D. Bowlin ("Bowlin") has served as a Company director since December 2006. He also serves as a member of the Compensation Committee. Upon information and belief, Defendant Bowlin is a citizen of Florida.

47. Defendant Dominick Zarcone has served as a Company director since January 2017. He also serves as a member of the Audit Committee and the Compensation Committee. Upon information and belief, Defendant Zarcone is a citizen of Wisconsin.

48. Defendants Jagdfeld and Ragen are sometimes referred to herein as the "Officer Defendants."

49. Defendants Jagdfeld, Avedon, Bowlin, Dixon, Jenkins, Lampereur, Morgan, Nguyen, Ramon, Roedel, and Zarcone are sometimes referred to hereinafter as the "Demand Defendants."

50. Defendants Jagdfeld, Ragen, Avedon, Bowlin, Dixon, Jenkins, Lampereur, Morgan, Nguyen, Ramon, Roedel, and Zarcone are sometimes referred to hereinafter as the "Individual Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

51. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust,

loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

52. The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

53. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

54. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

      a. manage, conduct, supervise, and direct the business affairs of the Company in accordance with all applicable laws;

      b. neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

15

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with applicable laws.

55.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or

officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

56. Further, Generac maintains a Code of Ethics and Business Conduct (the "Code of Ethics") which states that the Code was "designed to promote honest, ethical, and lawful conduct by all employees, officers and directors" of the Company.

57. The Code states, as to "Insider Trading and Fair Disclosure," that:

You must not trade in securities based on material non-public information (called inside information) that you may obtain in your role with Generac, unless that information has been reported publicly. It is against the laws of many countries, including the U.S., to trade or to "tip" others who might make an investment decision based on inside job information. For example, using inside information to buy or sell Generac stock or options or the stock of a Generac supplier or customer is prohibited.

58. The Code also states, as to "Accounting Practices, Books & Records and Record Retention," that:

All books, records and accounts must conform both to required accounting principles and to Generac's system of internal controls. We must never make false, misleading, or artificial entries in any financial books, records, and accounts. This includes such data as quality, safety, and personnel records, as well as all financial records. You are expected to support Generac's efforts in fully and fairly disclosing the financial condition of Generac, in compliance with applicable accounting principles, laws, rules and regulations, and making full, fair, accurate timely and understandable disclosure in our periodic reports filed with the Securities and Exchange Commission and in other communications to securities analysts, rating agencies, lenders and investors. Generac's accounting records are relied upon to produce reports for Generac's management, rating agencies, investors, creditors, governmental agencies, and others. Our financial statements and the books and records on which they are based must accurately reflect all corporate transactions and conform to all legal and accounting requirements and our system of internal controls.

59. The Company's Supplemental Code of Ethics for the CEO, CFO, and other Senior Officers (the "Supplemental Code") states that it is "applicable to the Chief Executive Officer ("CEO"), the Chief Financial Officer ("CFO") and other senior officers" of the Company. Specifically, the Supplemental Code is "applicable to each officer of the Company or its affiliates having any or all of the following responsibilities and/or authority, regardless of formal title: the president, the chief executive officer, the chief financial officer, the chief accounting officer, the controller, the treasurer, the chief tax officer, the chief legal officer, the chief of internal audit, any assistant general counsel responsible for finance matters, any assistant controller and any regional or business unit financial officer."

60. According to the Company, the purpose of the Supplemental Code is to ensure high levels of ethics and conduct for executive officers:

> The CEO, CFO and other senior officers of Generac that are subject to this Code of Ethics are also subject to the Business Conduct Code. In adopting both this Code of Ethics and the Business Conduct Code, the Company has recognized the vital importance of conducting its business subject to the highest ethical standards and in full compliance with all applicable laws and, even where not required by law, with the utmost integrity and honesty.

61. The Supplemental Code provides requirements for executive officer conduct by requiring each officer to:

> • Engage in and promote honest and ethical conduct, including by avoiding actual or potential conflicts of interest between personal and business or professional relationships;
>
> • Act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting material facts or allowing his or her independent judgment to be subordinated to the judgment of others;
>
> • Produce full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications;

• Comply with all applicable governmental laws, rules, and regulations (including, but not limited to, those relating to disclosure of the business activities and/or performance of the Company);

• Promptly report violations of this Code of Ethics, or of the Business Conduct Code, by designated senior management, to the appropriate persons;

• Protect the confidentiality of non-public information about the Company and its customers or suppliers or other business partners/co-venturers, and prevent the unauthorized disclosure of such information unless required by law;

• Ensure the responsible use of, and control over, all Company assets and resources entrusted to his or her care; and

• Assume accountability for compliance with, and the interpretation and enforcement of, this Code of Ethics.

62.     The Supplemental Code states, as to "Full, Fair, and Timely Disclosure; Adequacy of Disclosure Controls and Procedures and Internal Control Over Financial Reporting," that:

The Covered Officers are responsible under the federal securities laws and this Code of Ethics for assuring accurate, full, fair, timely and understandable disclosure in all of the Company's public communications, including, but not limited to, any report or other document filed with or submitted to the SEC or other governmental agency or entity, or in a press release, investor conference or any other medium in which a Covered Officer purports to communicate on behalf of the Company. Accordingly, it is the responsibility of each of the Covered Officers promptly to bring to the attention of the Chair of the Audit Committee any credible information of which he or she becomes aware that would place in doubt the accuracy and completeness in any material respect of any disclosures of which he or she is aware that have been made, or are to be made, directly or indirectly by the Company in any public SEC filing or submission or any other formal or informal public communication, whether oral or written (including, but not limited to, a press release).

In addition, each Covered Officer is responsible for promptly bringing to the attention of the Chair of the Audit Committee any credible information of which he or she becomes aware that indicates any deficiency in the Company's internal control over financial reporting within the meaning of Section 404 of the Sarbanes Oxley Act and the SEC's implementing rules, and/or the Company's disclosure controls and procedures for preparing SEC reports or other public communication as mandated by Section 302 of the Sarbanes-Oxley Act and the SEC's implementing rules, even if a materially inaccurate or incomplete disclosure by or on behalf of the Company has not resulted or is not expected imminently to result from such deficiency.

19

Each Covered Officer is reminded, moreover, that the Company is required by law and its Business Conduct Code to keep books and records that accurately and fairly reflect its business operations, its acquisition and disposition of assets and its incurrence of liabilities, as part of a system of internal accounting controls that will ensure the reliability and adequacy of these books and records and that will ensure that access to Company assets is granted only as permitted by Company policies.

63.     The Supplemental Code states, as to "Compliance with the Code of Ethics; Violations of Law," that:

Each Covered Officer will promptly bring to the attention of the Chair of the Audit Committee (or such other person as may be designated by the Board from time to time) any credible information he or she may receive or become aware of indicating:

• that any violation by a Covered Officer of this Code of Ethics either has occurred, may be occurring, or is imminent;

• that any violation of the U.S. federal securities laws or any rule or regulation thereunder by a Covered Officer has occurred, may be occurring, or is imminent; or

• that any violation by a Covered Officer of any other law, rule, or regulation applicable to the Company has occurred, is occurring or is imminent.

64.     The Company's Corporate Governance Guidelines (the "Guidelines") apply to the members of the Board, and "are intended as a component of the flexible governance framework within which the Board, assisted by its committees, directs the affairs of the Company." The Guidelines provide that the Board expects Company directors, as well as officers, to act ethically, and to adhere to the Company's business conduct policy.

65.     Under "Board Role," the Guidelines outline several responsibilities of the Board, including:

• providing advice and counsel to the Chief Executive Officer and senior executives;

* * *

• providing oversight of Company performance to evaluate whether the business is being appropriately managed;

20

* * *

• designing governance structures and practices to position the Board to fulfill its duties effectively and efficiently;

• providing oversight of risk assessment and monitoring processes;

• overseeing selection of appropriate auditing and accounting principles and practices;

• providing oversight of internal and external audit processes, financial reporting, and disclosure controls;

• overseeing compliance with applicable laws and regulations;

• setting expectations about the tone and ethical culture of the Company, and reviewing management efforts to instill an appropriate tone and culture throughout the Company;

66.     The Audit Committee Charter of Generac Holdings Inc. (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee members.

67.     Per the Audit Committee Charter, the Audit Committee oversees:

• management's conduct of, and the integrity of, the Company's financial reporting to any governmental or regulatory body, shareholders, other users of Company financial reports and the public;

• the Company's systems of internal control over financial reporting and disclosure controls and procedures;

• the qualifications, engagement, compensation, independence and performance of the registered public accounting firm that shall audit the annual financial statements of the Company (the "independent auditor") and any other registered public accounting firm engaged to prepare or issue an audit report or to perform other audit, review or attest services for the Company, their conduct of the annual audit of the Company's financial statements and any other audit, review or attestation engagement, and their engagement to provide any other services;

• the Company's legal and regulatory compliance;

• the application of the Company's related person transaction policy as established by the Board; and

• the application of the Company's codes of business conduct and ethics as established by management and the Board. In connection with the foregoing, the Committee shall engage in such activities as are necessary or appropriate in order for it to render the annual report of the Committee required to be included in the Company's annual report by the rules of the Securities and Exchange Commission ("SEC").

68.     Under "Responsibilities," the Audit Committee Charter outlines several responsibilities of the Audit Committee members in subsection C, "Oversee the Internal Audit Function, Internal Controls, and Financial Risk Management," in relevant part:

• review and consult with the Compensation Committee with regards to the appointment, reassignment, replacement, compensation or dismissal of the chief financial officer, chief accounting officer and/or controller;

• discuss with the independent auditor the responsibilities of the company's internal audit function and review periodically the performance of the internal audit function;

• review and oversee the effectiveness of procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, financial reporting or auditing matters and review and, as necessary, investigate any reports provided by SEC counsel to the Company regarding evidence of unremedied material violations of U.S. federal or state securities or any similar other law or a material breach of fiduciary duties by directors, officers, employees or agents of the Company arising under such laws;

• oversee management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures, including reviewing and discussing with management and the independent auditor (i) management's certification in the Company's periodic SEC reports concerning the Company's disclosure controls and procedures and any reports by management or the independent auditor of a material weakness or significant deficiency in internal control over financial reporting, (ii) the actions taken to remedy any such material weakness or significant deficiency and any changes in circumstances that have, or are reasonably likely to have, a material effect on internal control over financial reporting, (iii) management's annual assessment of the adequacy of the Company's internal control over financial reporting, (iv) the independent auditor's annual attestation report regarding the Company's internal control over financial reporting, and (v) any identified act of fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting or disclosure controls and procedures;

• review and discuss with management and the independent auditor any major financial risk exposures and assess the steps and processes management has implemented to monitor and control such exposures, and assist the Board in fulfilling its oversight responsibilities regarding the Company's policies and guidelines with respect to risk assessment and risk management, including any significant non-financial risk exposures;

69. Under "Responsibilities," the Audit Committee Charter outlines several responsibilities of the Audit Committee in subsection E, "Oversee Legal and Ethical Compliance," in relevant part:

review periodically with a member of the Legal Department or outside legal counsel: (i) legal and regulatory matters that may have a material impact on the Company's financial statements, including any material reserves for legal contingencies and any related financial statement disclosure, and (ii) the scope and effectiveness of the Company's legal and regulatory compliance policies and programs;

70. The Individual Defendants violated Generac's Code, Supplemental Code, Guidelines, and Audit Committee Charter by engaging in or permitting the Company to engage in issuing false and misleading statements to stockholders, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, two of the Individual Defendants violated Generac's Code by engaging in insider trading based on MPNI. In further violation of the Code, the Supplemental Code, the Guidelines and the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of Company records and reports, ensure the Company complied with applicable laws and regulations, and ensure that the Company conducted its business in an honest and ethical manner.

71. Further, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing false and misleading statements to stockholders, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty

and unjust enrichment. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessment and risk management, and failing to adequately oversee the Company's disclosure controls and procedures.

## V. FACTS

### A. Background

72. Generac is a Waukesha, Wisconsin-based company, founded in 1959, that designs, manufactures, and markets various forms of residential, commercial, and industrial power systems. Generac's products include generators, portable generators, light towers, pressure washers, and solar panels, among other things. Generac went public through an initial public offering ("IPO") in 2010 and trades today on the NYSE. For most of its history, Generac focused on backup power generators.

73. For three decades, Generac built a business centered on manufacturing and selling portable generators that could move from location to location to provide temporary electricity using gasoline, diesel fuel, or liquid propane. Then, in 1989, Generac launched its HSB generator business. A HSB generator is a permanent power generator connected to a home that provides a backup source of electricity in the case of a power outage.

74. The generators are also not essential. By design, they only provide electricity if there is a power outage, which is a relatively rare occurrence. According to the U.S. Energy Information Administration, electricity customers in the U.S. averaged just seven hours of power interruptions in all of 2021.

75. Generac has become largely dependent upon extreme weather to generate demand for its generators. For example, widespread power outages or repeated power failures that flood homes or cause inconvenience for homeowners without power, often as a result of extreme weather, have driven otherwise reluctant consumers to pay the price to add a generator.

76. Indeed, Generac emphasized in connection with its IPO that increasing "[d]isruptions to the aging U.S. power grid" presented the Company with a "market opportunity" and that "[d]emand for [Generac's] products is significantly affected by unpredictable major power-outage events." Accordingly, a number of high-profile power outage events in the 2000s led to increased HSB sales. On the heels of that success, Generac went public, raising more than $240 million in its IPO.

**B.**     **Generac Expands Into Solar Energy-Related Products**

77. In late 2019, the Company expanded its operations to solar energy-related products to generate additional revenue and appeal to investors. This was an expensive and risky venture for Generac.

78. Recognizing the difficulty of growing generator sales and the need to show long term growth potential as a public company following the IPO, Generac implemented a number of strategies to expand beyond the generator market. Not long after the IPO, Generac launched a corporate strategy called "Powering Ahead," which focused on acquiring other businesses to "transition from primarily a North America focused, energy backup generator company into a more diversified industrial technology company."

79. Then, in 2018, the Company launched its "Powering Our Future" corporate strategy that focused on acquiring businesses to provide "the initial foundation for the Company's evolution into an energy technology solutions company." The strategy of expanding into energy solutions,

rather than remaining a generator company, led to Generac's entry into the solar energy storage industry.

80.     In March 2019, Generac acquired Neurio Technology, Inc. ("Neurio"), an energy data company. Generac explained that Neurio's "hardware and software solutions equip users with the intelligence to manage and control electrical loads, solar systems and batteries to optimize energy consumption and increase savings."

81.     Then, in April 2019, Generac acquired Pika, which Generac described as "a manufacturer of innovative battery storage technologies that capture and store solar or grid power for homeowners and businesses." At the time of the Pika acquisition, Defendant Jagdfeld said, "'Pika's integrated battery storage solutions are a crucial omponent in developing a comprehensive system to store and consume clean energy' . . . . 'The visionary ideas and technology that Pika has developed give us a considerable edge as we expand into the rapidly developing market for energy storage.'"

82.     Later that year, Generac leveraged the technology acquired from Pika and Neurio to create "PWRcell" – a line of "clean energy products" that "captures and stores electricity from solar panels or other power sources and helps reduce home energy costs while also protecting homes from shorter duration power outages." Generac promotes PWRcell on its website as "not just a powerful battery, but is also the most flexible and scalable home energy system on the market." Generac's PWRcell products[3] are connected to solar panels (usually installed on a

---

[3] For reference, the PWRcell products that will be discussed herein include: (i) PWRcell, which is used to refer to the entire line of products for solar energy storage and sometimes used as shorthand to refer to the component battery used to store solar electricity for backup power; (ii) SnapRS, which is discussed extensively herein; (iii) "PV Link," which is the component used to link or connect multiple solar panels; and (iv) "PWRcell inverter," which converts the "direct current" electricity created by the panels to the "alternating current" used in homes. Generac and analysts refer to PWRcell products as being part of Generac's "solar" or "energy storage" business.

homeowner's roof) and they allow the homeowner to store and utilize electricity from solar power captured by the solar panels. Generac does not manufacture or sell the solar panels themselves.

83. The most significant component of PWRcell products to this case is the "SnapRS" device, which Generac advertised as "a simple way to satisfy rapid shutdown compliance for solar + storage systems." Under the 2017 National Electric Code ("NEC") and 2020 NEC, adopted by states throughout the country, solar panel systems are required to include a "rapid shutdown" function.

84. The rapid shutdown function is a fundamental safety requirement. Solar panel conductors become electrically charged any time the sun is shining. Without a rapid shutdown device, there is no way to quickly turn off that live current, which poses an electrocution risk to anyone who comes into contact with the solar panel system, including first responders requiring access to the roof. A rapid shutoff allows homeowners or first responders to quickly reduce that current to a safe level.

85. To comply with the NEC requirements, a single SnapRS is installed between each solar panel, and then between the solar panels and the PV Link.

86. Generac's website refers to PWRcell as "revolutionary technology." Leading up to and during the Relevant Period, the Individual Defendants made public statements to confirm that PWRcell was a critical product to the Company's future sales growth and that they were succeeding in selling and becoming profitable in this new line of business. For example, since its launch in late 2019, Individual Defendants have discussed PWRcell at every one of Generac's quarterly earnings calls. Likewise, in the Company's SEC filings, the Individual Defendants have repeatedly listed "Solar, storage, and monitoring markets developing quickly" among the Company's most important "Strategic Growth Themes."

27

87. Then, as PWRcell sales grew in 2020 and 2021, Individual Defendants repeatedly highlighted the sales success and the product's importance to the Company's strategy. On an October 28, 2020 earnings call discussing third quarter ("3Q") 2020 results, Defendant Jagdfeld said that "[s]hipment of our PWRcell energy storage systems . . . were a key contributor to the company's year-over-year growth, and we are expecting a further significant sequential increase in shipments during the fourth quarter." Defendant Jagdfeld added that Generac "achieved profitability for these products during the month of September [2020]" and claimed the Company was "far ahead of the expectations" that Generac had laid out for PWRcell in 2019.

88. The next quarter, during a February 11, 2021 earnings call, Defendant Jagdfeld highlighted that "shipments of our PWRcell energy storage systems met our aggressive expectations during the fourth quarter [of 2020], as revenue for these products continued to ramp as they increased approximately 75% on a sequential basis and were a key contributor to the company's year-over-year growth." He explained that this "tremendous growth in energy storage from essentially a start-up business was due to the important advances we have made in growing our capabilities around marketing, distribution, product development and sourcing of these products."

89. Thus, the importance of Generac's solar business was continually noted by the Individual Defendants throughout the Relevant Period, making it clear to stockholders that solar was critical to the Company's future growth and that Individual Defendants closely monitored Generac's solar products as a core business and growth driver. Confirming as much, during a February 2023 podcast interview, a Senior Director of Engineering at Generac described the solar business as "the future of Generac's core business," adding that "you're seeing a transformation of the whole organization focusing really in on solar" and "[t]he decisions that we're making from

a leadership level demonstrate our commitment, our focus, and our transition to the renewable energy sector."

### C.     __Generac's Channel Partners__

90.     Generac does not typically sell its generators or solar products directly to the end customer homeowner, nor does it install the products. Instead, Generac sells generators and solar products to "channel partners," who in turn sell them to the end customer and arrange installation. The most predominant channel partners for Generac are its network of thousands of independent authorized dealers.

91.     As to generators, a homeowner interested in an HSB generator can utilize the "Dealer Locator" function on Generac's website. By entering their location, the homeowner will be provided the name of several dealers in the area, who can be contacted to visit the home for an "in-home consultation" ("IHC") or do a "virtual-home consultation" ("VHC"). These consultations are tracked in order to gauge early-stage customer interest.

92.     If the homeowner enters a contract to purchase a generator, the dealer will later install product, either with its employees or through outside contractors. Historically, a dealer would either install a generator it had in its inventory or place an order to Generac for delivery, generally with minimal or no delay for production. As noted, Generac does not immediately record revenue upon receiving an order from a dealer, but instead records revenue upon shipment or delivery to the distributor (its customer), who is paid by the homeowner (the end customer).

93.     As to solar products, when Generac expanded into the solar market in late 2019, it applied a similar dealer-based process to grow the solar business.

94.     Because Generac uses "channel partners" or dealers to sell its generator and solar products, it also reports increases in dealers as indicative of increased demand. For example, during

a February 14, 2019 earnings call, Defendant Jagdfeld said that "you add dealers[,] [t]hey generally come on board as the market is – market demand cycle is higher."

### D. The COVID-19 Pandemic Causes a Surge in Generac's "Residential" Sales Segment

95. In March 2020, the World Health Organization declared COVID-19 a global pandemic. In the lead up to and following that declaration, stay-at-home, or shelter-in-place, orders and guidance were implemented throughout the U.S. In Wisconsin, the state issued the first of its stay-at-home orders on March 24, 2020, prohibiting, among other things, nearly all gatherings of individuals from outside a single household, most non-essential office operations, and in-person K-12 education.

96. While the pandemic had a devastating impact on some businesses, it provided a boost in sales to others. Generac was one such business that saw its sales spike as a result of the shift to staying at home. Just as severe weather would trigger homeowners to contemplate purchasing generators to protect from loss of power, the need to work from home and conduct in-home schooling resulted in a surge in demand for generators to protect against power outages.

97. The positive impact was both significant and immediate. For example, just after the pandemic started, during an earnings call on July 30, 2020, Defendant Jagdfeld touted the spike in sales, saying that "[r]elative to expectations, second quarter revenue dramatically exceeded our prior forecast . . . . primarily due to the higher-than-expected shipments of residential products."

98. Defendant Jagdfeld explained that "[h]ome standby shipments came in significantly higher than our prior forecast, primarily driven by robust demand as a result of the heightened awareness of the need for backup power since the onset of the COVID-19 pandemic." As a result of the unexpected windfall, Defendant Jagdfeld announced that Generac was

"significantly increasing [its] full-year revenue and earnings outlook for 2020, including much higher expectations for the second half of the year."

99.     Throughout 2020 and into 2021, the Company reported massive growth in Residential sales and worked to ramp up and maximize its production capabilities, resulting in more shipments and revenue. Generac's Residential sales growth, which includes both generators and solar products, is reflected in the following chart created from numbers publicly reported by Generac:



100.    In discussing full year 2020 results during a February 2021 earnings call, Defendant Jagdfeld touted Generac's "tremendous finish to 2020," with "all-time record performance for both the quarter and full year net sales." He reported that the "revenue outperformance was primarily due to higher shipments of home standby generators."[4]

---

[4] Jagdfeld also noted that during the same period the Company was "pleased that shipments of PWRcell energy storage systems met our aggressive expectations."

101.     At the same time, the second prong of Generac's long-term success, the recently launched solar energy storage business, was also growing and performing well in the pandemic. Defendant Jagdfeld reported on a February 2021 earnings call that "shipments of PWRcell energy storage systems increased significantly during the first year of commercial launch, particularly during the second half." He further highlighted the "tremendous growth in [clean] energy storage."

102.     However, the surge in generator sales following COVID-19 began to subside leading up to the second half of 2021.

**E.     The Company's Dangerous Solar Product Drastically Increases Risk and Liabilities**

103.     Prior to the Relevant Period, the dangerous defect in the SnapRS device that threatened Generac's solar business became known of within the Company. As discussed, Generac's SnapRS rapid shutoff device was meant to comply with important safety requirements designed to keep homeowners and first responders safe. However, as detailed below, by early 2021, SnapRS units began failing across the U.S. In short, the SnapRS units were defective and malfunctioning by turning on and off repeatedly, resulting in the units overheating and eventually deforming and melting during normal use. This defect would cause the SnapRS units to stop working, thereby harming the solar panels' performance, and even caused residential fires.

104.     The SnapRS defect gave rise to tens of thousands customer complaints, with dealers being overwhelmed by services calls and costs of replacing units, and exposed Generac to massive risk and liabilities. Ultimately, Generac's largest and most important solar dealer, Pink Energy, sued Generac in August 2022 for various breach of warranty, product liability, and breach of contract claims in the Pink Energy Action stemming from the SnapRS defects. The Pink Energy Action alleged hundreds of millions of dollars in damages, including $39 million in unpaid invoices to Generac for service calls related to the defective SnapRS, $155 million in lost revenue

from the defective SnapRS, and "hundreds of millions" in reputation and brand damage caused by the defective SnapRS. Soon after filing the Pink Energy Action against the Company, Pink Energy was forced out of business and declared bankruptcy.

105.    By April 2021, according to the Pink Energy Action and a media packet published by Pink Energy in July 2022 (the "Media Kit"), Pink Energy had reported to Generac that it discovered melted SnapRS devices during a service call for a customer who had complained of a lack of system production. Pink Energy described the defect as an over-heating event in which SnapRS devices showed clear signs of heat deformation, charring, and melting. In addition to contacting Generac to alert it of the deformed SnapRS devices, Pink Energy also provided photos of the melted units.

106.    In its Media Kit, Pink Energy provided a photo of melted SnapRS devices:



107.    In addition, in a video posted by Pink Energy on YouTube,[5] Pink Energy states that "in early 2021, we began to notice a significant increase in service calls related to solar system performance deficiencies and failures. These issues were traced back to a single component: the Generac SnapRS." The video adds that:

---

[5] https://www.youtube.com/watch?v=r4RKeFLR7X4.

SnapRS devices began to fail en masse. Due to some inherent fault, the devices began to experience thermal events that could ultimately lead to fire. Pink Energy at great expense began to replace tens of thousands of these units while Generac developed a firmware update that was supposed to be a permanent fix for these SnapRS failures.

108.    The video likewise provides certain photos of melted SnapRS units, such as:



109.    According to the allegations in the Pink Energy Action, by Summer 2021, Pink Energy had become aware that "other solar installers using these same Generac products were experiencing high rates of failure with the SnapRS connectors and were noticing signs of heat deformation in the SnapRS units during service visits." As one example, "[i]n early August 2021, the President of Valley Solar, another solar installer using Generac's products, reached out to . . . inquire about whether [Pink Energy] had noticed issues with Generac SnapRS," and "Valley Solar informed [Pink Energy] that it had noticed a 'very high rate with SnapRS failing and needing replacement' and that the SnapRS units were showing signs of 'heat deformation and even

charring.'"[6] Pink Energy further states that Valley Solar told [Pink Energy] that it had brought this issue to Generac's attention but had 'not gotten much of a response.'"

110.    By early August 2021, a residential fire had been caused by the SnapRS defect. As detailed in the Pink Energy Action, "in August 2021, a fire occurred at the home of [Pink Energy] customer, Lonnie Bentley, in Lancaster, Kentucky . . . It was later determined that the fire was caused by overheating of the SnapRS units."

111.    In a phone call regarding the fire, a Generac executive did not dispute that SnapRS devices were overheating, as the Pink Energy Action states:

> On August 12, 2021, [Pink Energy] and Generac participated in a conference call during which [Pink Energy] inquired about the cause of the fire and potential hazards associated with SnapRS. During this conference call, Uwe Uhmeyer, Generac's Vice President of Engineering, informed [Pink Energy] that Generac was investigating the cause of the SnapRS overheating but had not yet identified the precise cause of the issue.

112.    Further confirming that the SnapRS defect had been widespread and required corrective action, Generac told Pink Energy during the same call that it "was investigating 'bulging and separation' issues associated with the SnapRS connectors and that it was in the process of developing and testing an updated model of the SnapRS which Generac referred to the 801A."

113.    Another residential fire was caused by a defective SnapRS unit on August 18, 2021, at the home of Pink Energy customer Stephen Nightingale in Lexington, South Carolina. According to the Pink Energy Action, "[f]ollowing a fire inspection, the cause of the Nightingale claim was determined to be a melting and/or exploding SnapRS." In a lawsuit filed by Kristen and Stephen Nightingale against Generac on January 9, 2023, the Nightingales allege that "[o]n August

---

[6] According to its website (https://valleysolar.solar/), Valley Solar is "one of the largest independent solar contractors in the state" of Massachusetts and advertises its team as "[b]attery [s]torage [e]xperts," highlighting that Valley Solar "installed among the most battery systems in the state in 2021."

18, 2021, [their] home caught fire as a result of a failure in the solar panel system designed and manufactured by Generac. The fire did substantial damage to the Nightingales' home and their solar panel system." The Nightingales added that "[t]he solar panel equipment . . . was in a defective condition [and] unreasonably dangerous as supplied by Generac," which "was due either to a design or manufacturing defect."

114.    The Pink Energy Action describes an email received the day after the Nightingale fire, in which Generac again confirmed the existence, and Generac's knowledge, of the overheating defect: "On August 19, 2021, Jeffrey McAndrew, Generac's Director of Sales for its East Region ("McAndrew"), informed [Pink Energy] that Generac had 'a fix in test' for the SnapRS overheating issues that it planned to release by late August 2021." The lawsuit continues:

> McAndrew informed [Pink Energy] that Generac discovered that a few SnapRS units were found to be overactive by turning on and off repeatedly when they should have been in either the "on" or "off" state, which condition generated heat in the unit causing them to "bubble out." McAndrew assured [Pink Energy] that Generac's new firmware would address the issue by keeping the signal constant (in the "on" position) until there is a forced rapid shutdown.

115.    According to the Pink Energy Action, this email was followed by another email later the same day, in which McAndrew "stated that Generac was sending the firmware updates 'today to a bunch of sites then the rest will happen over the next few days.' McAndrew closed this email by telling [Pink Energy] 'all good though. So glad that was resolved quickly."

116.    But the firmware update did not solve problems. First, it was only available to customers who had their solar systems connected to the internet. Many solar systems were not connected to the internet, and were therefore unable to receive the firmware update, and remained at risk of failed or dangerous performance. According to Pink Energy, Generac was "aware that a significant number of [Pink Energy]'s customers had not received the firmware update because their solar energy systems were not connected to the internet."

117.    And second, as explained in the Pink Energy Action:

Beginning in late 2021, [Pink Energy] noticed a dramatic spike in complaints from customers claiming that their solar energy systems were not producing the energy output they had been promised, were not seeing noticeable savings on their monthly utility bills, and/or experiencing complete shutdowns of their solar energy systems indicated by error messages on their Generac inverters.

118.    Pink Energy then "investigated this issue and learned that the cause of its customers decreased production and/or system shutdown was what the Generac inverter coded as a 'PVRSS Lockout' system error." In its lawsuit, Pink Energy says it "learned that a PVRSS Lockout is caused when a PV Link or inverter detects a malfunctioning or overheating SnapRS in a particular array of solar panels. When this happens, the entire array goes into 'lockout mode' and the array does not generate any power until the lockout is cleared." As explained below, this lockout was caused by the firmware update and posed a significant problem, as "[c]learing a PVRSS Lockout generally requires a service technician to replace the SnapRS on the array that is in lockout mode." In late 2021, Generac also began supplying dealers with a second generation SpanRS to try to resolve the defect – the "SnapRS 801A." According to the Pink Energy Action, "Generac instructed [Pink Energy] to only replace the SnapRS units that were charred or melted and to leave any undamaged units in place," and "Generac represented to [Pink Energy] that the SnapRS 801A had been redesigned to fix the product defect in the SnapRS 801 that was causing the SnapRS to melt, burn, or otherwise malfunction." The lawsuit adds that Pink Energy "did not see any reduction in incidents of PVRSS Lockouts in customers after replacing the SnapRS 801s with 801As" but instead "continued to see the same defects in the 801As, including solar arrays going into PVRSS Lockout due to defective SnapRS 801As, resulting in [Pink Energy] service technicians removing burnt and melted 801As from its customers' solar energy systems."

119. Thus, according to the Pink Energy Action, "[i]n late 2021 and into early 2022, [Pink Energy] experienced a massive increase in customer service calls and complaints related to the PVRSS Lockout that required [Pink Energy] to shift its business away from installation of new solar energy systems and toward maintenance of existing customers' systems that were experiencing PVRSS Lockouts and other issues caused by burning, melting, or otherwise malfunctioning SnapRS units."

120. The widespread defect exposed Generac to substantial warranty and liability claims. According to the Pink Energy Action, in December 2021, Pink Energy entered into a contract with Generac through which "Generac agreed to defend, indemnify, and hold [Pink Energy] harmless from third-party claims arising from, or in connection with, manufacturing defects resulting in injury, death or damage to real or personal property." The Pink Energy Action states that "Generac acknowledged" that this agreement "would apply retroactively to any third-party claim relating to or involving defects in the SnapRS whether existing prior to, or after, the effective date."

121. To place the SnapRS defect claims in numerical context, Pink Energy says that before "the PVRSS Lockout issues caused by Generac's firmware update, [Pink Energy] averaged approximately 800 phone calls into its customer service center per month," but "[a]fter the PVRSS Lockout issues began [in late 2021] and through the current date [August 1, 2022], [Pink Energy] has averaged approximately 30,000 calls into its customer service center per month, amounting to an approximately 3,650% increase in customer service calls during this period." Pink Energy further claims that, "[i]n total, [Pink Energy] has approximately 19,000 customers with solar energy systems that utilized the . . . SnapRS" and that "approximately half of these customers have experienced PVRSS Lockouts requiring replacement of the SnapRS."

122.    Generac continued to admit the SnapRS defects. For example, according to the Pink Energy Action:

(a) In May 2022, "Generac finally agreed to send a letter to a selection of [Pink Energy]'s customers to address these product failures." The letter stated that Pink Energy customers "'may have experienced certain issues with a particular Generac component of your solar energy system, the SnapRS801 or 801A'" and that Generac had developed the new SnapRS802, which had been "'designed to replace the RS801 and RS801A, increasing performance and reliability.'"

(b) On June 1, 2022, Defendant Jagdfeld "responded to an email regarding continued incidents of burned and melted SnapRS devices" stating, "'all of our testing has shown that as long as the system has the latest firmware protections, it is safe from any kind of thermal situation as the system would lock out the PV link and associated string - this was an interim solution until those 802 modules were on the market.'" This email confirmed that: (i) the firmware update was designed to cause the lockouts whenever a defective SnapRS was detected; and (ii) the firmware update was only an "interim solution" until the SnapRS 802 devices were available.

(c) Also in June 2022, Generac "acknowledged a near 50% failure rate in the SnapRS units, accounting for the approximately 41% of [Pink Energy] customers that have experienced PVRSS Lockouts and another 8% that never received the firmware update."[7]

(d) The next month, in July 2022, Generac informed Pink Energy that "a significant number of [Pink Energy]'s customers never even received the firmware update because their PWRcell system was not connected to the internet."

123.    In addition, following several public disclosures toward the end of the Relevant Period revealing the SnapRS defect and its impact on the Company, in December 2022, analysts from BofA Securities reported on their recent conversations with members of Generac's management team, including the "head of its Clean Energy Business." The analysts wrote that, regarding the "product challenges with PWRcell," management "noted that it needs to rebuild trust

---

[7] The Pink Energy Action notes that, "[i]ncredibly, Generac made this admission as if to not fully understand or appreciate the magnitude of the problem, implying to [Pink Energy] that it was positive news that the failure rate was not yet close to 100%."

with industry participants and dealers after the product challenges that ensued shortly after launch," which, as discussed, was in late 2019 and early 2020.

124. Following the filing of the Pink Energy Action, multiple consumer class action complaints were filed against Generac between October 2022 and July 2023. The allegations in these cases detailed the SnapRS failures, including those during the Relevant Period.[8]

## F. Generac's Solar Sales Are Highly Concentrated in a Single Channel Partner: Pink Energy

125. In addition to the SnapRS defect, the Individual Defendants were aware before and during the Relevant Period that another aspect of the Company's solar business threatened its growth and success: Generac was overly dependent upon only one solar channel partner, Pink Energy, for the sales and installation of its solar products. As discussed, after years of focusing primarily on HSB generators, Generac launched its PWRcell solar products in late 2019. According to the Pink Energy Action, in late 2019 and January 2020, Generac met with and traveled to Pink Energy to solicit its business as a channel partner.

126. After negotiations, the two sides reached agreement on a partnership whereby Pink Energy would purchase and install Generac PWRcell products. The companies began to jointly market the new partnership, and Generac agreed to provide Pink Energy with leads for potential solar customers generated by Generac's marketing.

---

[8] Industry professionals likewise turned on Generac. In January 2023, after previously touting the PWRcell system, the founder of "Solar Surge" stated in an online video that he is "no longer promoting Generac as our preferred whole home battery backup solution." He stated that "the big reason" was "service and reliability." Specifically, he said that SnapRS devices were "overheating and melting and causing normal functioning solar systems to cut out." He added that "these devices failed by the tens of thousands," and that Pink Energy, a "primary Generac dealer and one of the largest installers nationwide," ultimately filed for bankruptcy "in large part because of the unexpected warranty service cost associated with the SnapRS device repair."

127. Generac understood the need for a diversified network of dealers and routinely made public comments regarding its purported broad array of dealers for its solar business. For example, even before it partnered with Pink Energy, a January 2020 Company press release claimed that the PWRcell products were "[o]ffered through [Generac's] vast network of partner installers."

128. During a May 2020 Goldman Sachs Industrials and Materials Conference, Defendant Ragen emphasized the importance of a broad and diversified network of solar dealers to the Company's solar power growth and success, stating:

> When in a very underpenetrated market, you need to have . . . very broad channels of distribution and a large pipe to be able to sell your products through. And we did that on the legacy residential power generation side. . . . So we extended -- we are extending that philosophy into clean energy and building out a broad distribution network as we speak. We started in the back half of 2019, and we continue to do that today.

129. When asked about the "number of [solar] distribution partners that you folks have today," Defendant Ragen emphasized that "we've trained over 1,000 independent solar installers" and that "[i]t's ramping nicely." Two months later, during a July 30, 2020 earnings call, Defendant Jagdfeld said, "[w]here we have had a lot of really great success is signing new partners for our clean-energy initiatives, so solar dealers on a direct basis."

130. But, unbeknownst to stockholders, Generac was disproportionately dependent on Pink Energy, rather than growing through a "broad" and diversified dealer network. Pink Energy was pushing hard to sell Generac products. A November 2020 *Business Insider* article based on conversations with Pink Energy sales representatives and customers reported that Pink Energy "reps are required to add" PWRcell batteries "to most [solar system] configurations."

131. Generac's undisclosed over-reliance on Pink Energy was significant for multiple reasons. First, it caused Generac's solar business to be tied in large part to the success of Pink

41

Energy. Whereas a company with a diversified dealer network of more than 2,000 dealers providing similar levels of orders would be relatively unaffected by the sudden underperformance or termination of any one dealer, Generac was at risk of being severely impacted by the sudden underperformance or termination of Pink Energy.[9]

132.    Second, by being so heavily tied to a single distributor, Generac was at risk of suffering reputational harm from that distributor's reputation and business practices. And Pink Energy reportedly had a poor reputation in the solar industry for engaging in predatory marketing and business practices.

133.    Pink Energy was profiled by *Business Insider* in 2020 for its "misleading tactics to lure customers into home solar deals," such as "tout[ing] [a federal] tax incentive when selling systems to homeowners" even if the sales representative knew those customers were "unlikely to get the credit" and "exhibit[ing] a pattern of inflating the benefits of its products."

134.    Third, the dangerous solar product defects compounded the risks of Generac's overreliance on Pink Energy, because it put Generac's sales and Pink Energy's business at risk. As noted, Pink Energy was an aggressive seller of Generac's products as it required representatives to add the products to solar installations. As those products became defective, Pink Energy was required to dedicate time and energy to resolving the defect, rather than selling Generac products. Here, as detailed above, defects in SnapRS products caused Pink Energy to be overwhelmed with service calls and forced Pink Energy to spend its own money and resources to try to rectify the defect. Ultimately, Pink Energy declared bankruptcy and ceased operations as a result of the SnapRS defect, stating in an announcement:

---

[9] Averaging sales across the 2,000 solar dealers would result in each dealer accounting for 0.05% of solar sales. Yet, Pink Energy accounted for what analysts estimated to be more than half. Put differently, Pink Energy would have sold more than the other 1,999 dealers combined.

Due to rampant consumer discontent resulting from faulty Generac solar equipment, Pink Energy has been forced to close its doors permanently.

We exhausted all avenues to find a way forward that would allow us to service all past, present and future customers and are devastated that we can't do so.

135.    Yet this high sales concentration in a single dealer was not disclosed by the Individual Defendants until near the end of the Relevant Period. And it was only at the end of the Relevant Period that Defendant Jagdfeld finally admitted Pink Energy was actually "a large customer" and a "really important customer for [Generac]." In a September 2022 press release, Pink Energy confirmed that Generac's "SnapRS units . . . have been part of nearly every Pink Energy solar energy equipment installation since 2020." Then, after Pink Energy ceased operations in October 2022, Generac attributed a stunning $185 million reduction in guidance to the loss of Pink Energy. According to analysts from William Blair, the existing guidance assumed "core clean energy" sales – i.e., PWRcell products – of $350 million, meaning that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales."

G.    **The Individual Defendants' False and Misleading Statements During the Relevant Period**

136.    Separate and apart from the aforementioned misconduct, throughout the Relevant Period, certain of the Individual Defendants made materially false and misleading statements and/or omissions in connection with the SnapRS Misconduct. The Individual Defendants' false and misleading statements were made, among other things, in Generac's financial reports filed with the SEC, press releases, and during earnings calls.

137.    On April 29, 2021, the Company held an earnings call to discuss Generac's results for the first quarter of 2021. During the call, Defendant Jagdfeld emphasized the large system of Channel Partners the Company compiled to sell, install, and service its products, stating "[w]e also have had encouraging success further building out our installer network as we've trained and

certified approximately 2,000 dealers as of the end of the quarter with approximately 800 dealers registered on our PowerPlay CE selling system."[10]

138.    During the same call, Defendant Ragen stressed the importance of the Channel Partner network to the commercial success of Generac's Residential Solar Energy Solutions division, telling stockholders that "higher demand for our PWRcell energy storage systems as we continue to make further progress in building out distribution partners in the clean energy market" was "contributing to the improved outlook."

139.    On July 28, 2021, the Individual Defendants caused the Company to issue a press release, filed with the SEC on a Form 8-K, announcing its financial results for its second fiscal quarter ended June 30, 2021. The press release stated that Generac's Residential Solar Energy Solutions division was strong and enjoying "very strong growth" in PWRcell sales as "demand for PWRcell energy storage systems continues to increase."

140.    Later that same day, July 28, 2021, the Company held an earnings call to discuss Generac's results for the second quarter of 2021. During the call, Defendant Jagdfeld again touted the sales strength of PWRcells, stating that "[s]hipments of PWRcell systems also experienced strong growth sequentially as we gained further traction in the rapidly expanding solar plus storage market. In addition to the strong revenue growth, key performance indicators for Clean Energy continue to show favorable trends." Defendant Jagdfeld further reiterated "we further built out our installer network during the quarter, and we ended the first half of the year with approximately 2,200 trained and certified dealers with nearly 900 of those dealers registered on our PowerPlay CE selling system."

_____

[10] PowerPlay CE connects prospective customers of Generac's clean energy products to Generac's Channel Partners who can directly sell and install Generac products to customers.

141.    During the same call, Defendant Ragen announced that the Company was doubling its sales guidance for the Residential Solar Energy Solutions division for 2021, stating:

> We've publicly said we did about $115 million of sales last year, looking to double that here in 2021. And sequentially, that's going to ramp from Q2 to Q3. And then again into Q4 so that we're looking to successively ramp our output of those products over the quarters here, and really into next year, that's the expectation. The market is there, the demand is there. We've said publicly that the demand is outstripping our supply and that's what we're working on right now to ramp up 2022.

142.    On September 27, 2021, the Individual Defendants caused Generac to release its Environmental Sustainability Policy report, which stated, "[a]s a manufacturer, we go beyond regulatory compliance with an all-encompassing philosophy that involves our employees, training efforts, production processes, and products."

143.    On September 29, 2021, Generac's annual stockholders' meeting was held. During the meeting, the Individual Defendants caused the Company to tout its "dramatic growth" with "a lot of earnings power from an EPS standpoint." The Individual Defendants further caused Generac to characterize its Residential Solar Energy Solutions division as "clean, reliable, and affordable."

144.    On November 2, 2021, the Individual Defendants caused the Company to file a Form 8-K with the SEC which contained an affirmative statement in the "Product Liability; Product Warranties and Recalls" section telling stockholders that none of the Company's products were defective or presented a possibility of any products not meeting warranty expectations:

> [This is] an accurate and complete list of warranty claims and rebate reports, in each case with respect to product malfunctions or property damage issues, for the three years ended on the date of this Agreement. . . . [D]uring the past three years there has been no Action pending or, to the Company's Knowledge, threatened, relating to alleged defects in Company Products or the failure of any such products to meet the warranty specifications or material contractual commitments applicable to such products.

145. On November 4, 2021, the Individual Defendants caused the Company to filed its Quarterly Report on Form 10-Q with the SEC for its third fiscal quarter (the "3Q 2021 10-Q"), signed by Defendant Ragen, which promoted the Company's earnings by stating that earnings per share ("EPS") were $1.98, and that the Company's net income was significantly higher than the previous year; specifically, "$407.6 million as compared to $225.6 million in the prior year period." The 3Q 2021 10-Q told stockholders that "[i]n the opinion of management, all adjustments (which include only normal recurring adjustments except where disclosed) necessary for the fair presentation of the financial position, results of operation, and cash flows have been made." The 3Q 2021 10-Q also stated the following about the Company's warranty policies:

> The Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable.

146. Attached to the 3Q 2021 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 (the "Exchange Act") and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jagdfeld and Ragen attesting to the accuracy of the 3Q 2021 10-Q.

147. On February 22, 2022, the Individual Defendants caused the Company to file its Annual Report on Form 10-K with the SEC for its fourth fiscal quarter and fiscal year 2021 (the "2021 10-K"), signed by Defendants Jagdfeld, Ragen, Morgan, Avedon, Dixon, Jenkins, Lampereur, Ramon, Roedel, and Zarcone, which promoted the Company's earnings by stating that EPS were $8.51, and that the Company's net income was significantly higher than the previous year, specifically, "$550.5 million as compared to $350.6 million in the prior year period."

148.    The 2021 10-K also disclosed a change in preexisting warranty reserves of approximately $4.4 million, but kept the warranty disclosure substantially similar to the warranty disclosure in the 3Q 2021 10-Q, stating:

> The Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable.

149.    Attached to the 2021 10-K were SOX certifications signed by Defendants Jagdfeld and Ragen attesting to the accuracy of the 2021 10-K.

150.    On April 29, 2022, the Individual Defendants caused the Company to file its 2022 Proxy Statement with the SEC. Defendants Jagdfeld, Morgan, Avedon, Dixon, Jenkins, Lampereur, Nguyen, Ramon, Roedel, and Zarcone solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

151.    The 2022 Proxy Statement asked Generac shareholders to (1) elect Defendants Jagdfeld, Lampereur, Bowlin, and Nguyen; (2) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2022; and (3) approve, on an advisory, non-binding basis, a "say-on-pay" resolution to approve the compensation of the Company's executive officers.

152.    The 2022 Proxy Statement noted that the Company has adopted "corporate governance guidelines and principles…[that] outline the role of our Board of Directors, the composition and operating principles of our Board of Directors and its committees, and our Board of Directors' working process." The 2022 Proxy Statement also noted that the Company adopted a "Code of Ethics and Business Conduct that applies to all our directors, officers and employees,

including our principal executive officer and principal financial accounting officer." The 2022 Proxy Statement further noted that the Company adopted a "Supplemental Code of Ethics and Conduct that applies to all our directors and executive officers, including our principal executive officer and principal financial accounting officer."

153. The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, Generac's Code, Guidelines, and Supplemental Code were not followed, as the Individual Defendants caused the Company to engage in the Snap RS Misconduct described herein, including disseminating false and misleading statements to be issued to stockholders.

154. The Individual Defendants also caused the 2022 Proxy Statement to be false and misleading with regard to executive compensation, in that they purported to take into consideration the Company's performance based on financial measures while failing to disclose that such measures were being artificially inflated by the Individual Defendants' false and misleading statements, and therefore any compensation based on the Company's financial performance was artificially inflated.

155. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders re-elected Defendants Jagdfeld, Bowlin, and Lampereur to the Board, allowing them to continue breaching their fiduciary duties to Generac, and elected Defendant Nguyen to the Board, who breached her fiduciary duties to the Company. Furthermore, as a result of the material misstatements and omissions in the 2022 Proxy Statement, Company shareholders approved Deloitte & Touche LLP as the Company's independent registered accounting firm for the year ending December 31, 2022 and approved, on an advisory basis, a "say-on-pay" resolution approving the compensation of the Company's executive officers.

156.     The 2022 Proxy Statement also failed to disclose that: (1) Generac was engaging in the SnapRS Misconduct; (2) as a result, Generac's largest Channel Partner, Pink Energy, faced significant liability and eventual bankruptcy; (3) due to the foregoing, Generac misrepresented its warranty liability; (4) consequently, Generac overstated its earnings throughout the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

157.     On May 9, 2022, the Individual Defendants caused the Company to file its Quarterly Report on Form 10-Q with the SEC for its first fiscal quarter (the "1Q 2022 10-Q"), signed by Defendant Ragen, which reported the Company's earnings by stating that EPS were $1.61, and that the Company's net income was lower than the previous year, specifically "$113.9 million as compared to $149.0 million in the prior year first quarter."

158.     The 1Q 2022 10-Q also disclosed a change in preexisting warranty reserves of approximately negative $1.1 million, but kept the warranty disclosure substantially similar to the warranty disclosure in the 3Q 2021 10-Q and the 2021 10-K, stating:

> The Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable.

159.     Attached to the 1Q 2022 10-Q were SOX certifications signed by Defendants Jagdfeld and Ragen attesting to the accuracy of the 1Q 2022 10-Q.

160.     On June 29, 2022, the Individual Defendants caused the Company to  release its 2021 Environmental, Social, and Governance Report. The report touted Generac's commitment to product safety, stating that:

Generac maintains a robust product safety function that is involved in all aspects of product design and production. We have a Product Safety Committee that participates in our new product development process in an effort to ensure that our products meet all applicable internal engineering design and safety standards, including those issued by the Consumer Product Safety Commission. This team performed 22 hazard reviews for products under development in 2021, and also regularly reviews any safety concerns associated with products in the field, including potential product recalls. Our engineering team maintains rigorous design standards that account for product safety at every stage of product development, and products go through multiple rounds of design review to ensure that safety is paramount.

161.    On August 8, 2022, the Individual Defendants caused the Company to file its Quarterly Report on Form 10-Q with the SEC for its second fiscal quarter (the "2Q 2022 10-Q"), signed by Defendant Ragen, which reported the Company's earnings by stating that EPS were $2.24, and that the Company's net income was higher than the previous year, specifically "$156.4 million as compared to $127.0 million in the prior year second quarter."

162.    The 2Q 2022 10-Q also disclosed a change in preexisting warranty reserves of approximately $5.6 million, but kept the warranty disclosure substantially similar to the warranty disclosure in the 3Q 2021 10-Q, 2021 10-K, and 1Q 2022 10-Q, stating:

The Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable.

163.    Attached to the 2Q 2022 10-Q were SOX certifications signed by Defendants Jagdfeld and Ragen attesting to the accuracy of the 2Q 2022 10-Q.

164.    The Individual Defendants' statements identified above were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Generac was engaging in the SnapRS Misconduct; (2) as a result, Generac's largest

Channel Partner, Pink Energy, faced significant liability and eventual bankruptcy; (3) due to the foregoing, Generac misrepresented its warranty liability; (4) consequently, Generac overstated its earnings throughout the Relevant Period; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Generac's public statements were materially false and misleading at all relevant times.

### H. The Truth Begins To Emerge

165. Starting in November 2021, the truth about the negative trends in the Company's business, began to materialize and/or leak into the market, including through a series of partial disclosures, resulting in massive declines in the price of Generac's common stock. The truth regarding the solar business began to be revealed in February 2022 through late 2022 as the dangerous defect led to partial disclosures increasingly revealing the massive scope and magnitude of the defect and its impact on dealers, increased warranty liabilities, and a massive reduction in financial guidance further revealing the over-concentration of sales in Pink Energy and failure to build a broad and diversified base of dealers.

166. On February 17, 2022, analysts from Roth Capital Partners issued a report that began to partially reveal the SnapRS defect. The analysts reiterated their "Buy" rating and reiterated the Individual Defendants' statements touting "robust IHCs and demand for HSB," but noted that "[t]he one area of concern we have is for its Clean Energy segment as the company has been dealing with some SnapRS issues. A solution appears to have been put in place, but our checks suggest it'll still take some time to be resolved." After these disclosures, the price of Generac stock fell from $316 per share on February 16, 2022 to $303 per share on February 17, 2022, and the stock continued to $295 the next day.

167. On June 22, 2022, stock research firm Spruce Point Capital Management ("Spruce Point") published a research report challenging the market valuation of Generac common stock.

The Spruce Point report included additional information partially revealing the scope and magnitude of declining demand in HSB generator demand, as well as information partially revealing Generac's concentration of solar sales through Pink Energy and its attendant risks.

168.     Spruce Point also analyzed the residential dealer counts reported by Generac, and noted that the lack of growth initially disclosed in November 2021 had continued. Spruce Point stated that "[w]e observed that [the Company's] deal[er] growth started to stall in the middle of 2021 and has been flat now for three quarters. All the while Generac's financial condition has been deteriorating." The Spruce Point report included the following chart showing that dealer growth had gone stagnant:

| | 2017 | 2018 | 2019 | 2020 | | | | 2021 | | | | 2022 |
| | | | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential Dealers | 5,700 | 6,000 | 6,500 | 6,500 | 6,700 | 7,000 | 7,300 | 7,700 | 8,000 | 8,100 | 8,100 | 8,100 |
| YoY Growth | 5.6% | 5.3% | 8.3% | -- | -- | -- | 12.3% | 18.5% | 19.4% | 15.7% | 11.0% | 5.2% |
| QoQ Growth | -- | -- | -- | -- | 3.1% | 4.5% | 4.3% | 5.5% | 3.9% | 1.3% | 0.0% | 0.0% |

Source: Generac conference calls, investor presentations, and SEC filings

169.     Turning to Generac's solar business, Spruce Point began to reveal concerns about concentration of dealers and risks of concentration in Pink Energy. Spruce Point reported that dealers (but not Pink Energy) were leaving Generac, writing, "[o]ur recent channel checks into twelve (12) Generac promoted large regional distributors indicates that only six (6) still carry its products."

170. In addition, Spruce Point raised concerns about concentration of sales in Pink Energy given that it, and others, were "alleged to be using deceptive marketing practices to fuel sales growth." Most notably:

> Powerhome Solar (now dba as Pink Energy) one of Generac's largest partners in over 13 states, has had multiple investigations into its sales practices and has allegedly overcharged for Generac batteries. Its CEO settled charges with a State Attorney General earlier in his career, while the Chief Marketing Officer settled charges by the FTC for deceptive marketing practices. A recent source says that Pink Energy is under FTC investigation.

171. Reflecting that stockholders were not aware of how dependent Generac was on Pink Energy and identifying the concern of the risks of concentration, Spruce Point rhetorically asked: "How much in sales has Generac done with this organization and why after numerous investigations showing the alleged fraudulent practices, does Generac continue to promote them as partners?"

172. After these disclosures, the price of Generac common stock declined from $220 per share on June 21, 2022 to $213 per share on June 22, 2022.

173. On August 1, 2022, Pink Energy filed the Pink Energy Action against Generac in the Western District of North Carolina, further partially revealing the scope and magnitude of the dangerous SnapRS defect. Pink Energy claimed that Generac had engaged in "wanton, willful, and reckless conduct . . . by":

> (i) concealing the SnapRS defects from [Pink Energy], (ii) failing to inform [Pink Energy] of the devastating effect the firmware update would have on its customers' solar energy system production, and (iii) fail[ing] to develop a suitable alternative to the defective SnapRS units [which] has had a devastating effect on [Pink Energy's] business.

174. In the Pink Energy Action, Pink Energy set forth the history of the SnapRS failures experienced by it and its customers, including the overheating and melting issues discovered in early 2021, the residential home fires caused by the SnapRS defect, Pink Energy's communications

with Generac employees and executives, and the onslaught of customer complaints and issues caused by the SpanRS defect. Pink Energy alleged that it suffered a $155 million loss in revenue due to contract cancellations related to the SnapRS defect and millions of dollars in damages due to the unprecedented influx of customer service calls related to the faulty SnapRS units.

175.    Although the Pink Energy Action was not widely reported on and was not immediately discussed in major publications or analyst reports, following the filing of the lawsuit, the price of Generac shares still declined from $268 per share on July 29, 2022 to $265 per share on August 1, 2022.

176.    In September 2022, additional news continued to further reveal the true extent of the scope and magnitude of the negative trends from the solar product defects.

177.    On September 12, 2022, Pink Energy issued a press release, which was covered by multiple news outlets, that further revealed the scope and magnitude of product defects as Pink Energy stated it had been forced to lay off approximately 500 employees "because of the same Generac product issues" alleged in the Pink Energy Action.

178.    After these disclosures, the price of Generac stock fell from $238 per share on September 9, 2022 to $233 per share on September 12, 2022, and then continued to decline to $213 the next day.

179.    On September 22, 2022, multiple media outlets reported regarding a letter from Pink Energy that further revealed that the scope and magnitude of the SnapRS defect was larger than previously understood, as the letter informed employees that Pink Energy would shut down, citing "financial difficulties resulting from issues with Generac equipment."

180.    After these disclosures, the price of Generac stock fell from $176 per share on September 21, 2022 to $171 per share on September 22, 2022. Notably, as news leaked to the

market, the price of Generac stock declined on every trading day from September 9, 2022 through September 22, 2022. In total, the stock declined in that time by more $65 per share.

181.    On October 7, 2022, Pink Energy filed for bankruptcy. However, various media in September and early October 2022 repeated a Generac statement blaming Pink Energy for SnapRS issues, stating:

> In certain situations, especially when product installation guidelines have not been followed, as appears to be the case with some Pink Energy installations, customers may have experienced certain issues with a particular Generac component of their solar energy system – the SnapRS 801 or 801A. . . . It is unfortunate that Pink Energy, as the installer and service provider of such products, has made the unilateral decision to quit offering Generac warranty support despite the availability of parts.

182.    Then, on October 19, 2022, Generac published a press release reporting preliminary disappointing financial results for 3Q 2022. For example, Generac reported just $664 million in residential sales, a 26% decline from the prior quarter, representing a massive decline in year-overyear growth. Generac further reported that "[p]reliminary net income attributable to the Company during the third quarter was approximately $58 million, or $0.83 per share, as compared to $132 million, or $1.93 per share, for the same period of 2021," representing a 56% year-over-year decline.

183.    The Company also further revealed the impact of the SnapRS defect, as the press release disclosed that the reported preliminary net income "includes pre-tax charges totaling approximately $55 million, including approximately $37 million of clean energy product warranty-related matters and approximately $18 million of bad debt expense related to a clean energy product customer [i.e., Pink Energy] that has filed for bankruptcy." Further revealing the scope and magnitude of the weakened HSB demand and over consolidation of sales in Pink Energy, in the press release, Defendant Jagdfeld admitted the results "'fell short'" and attributed

the poor sales numbers to "'[r]esidential product sales'" that were pressured due to "'higher field inventory levels and lower home standby generator orders from our channel partners'" and "'clean energy shipments [that] were negatively impacted by a large customer which ceased operations [i.e., Pink Energy] and has since filed for bankruptcy protection.'"

184. After these disclosures, the price of Generac stock fell from $148 per share on October 18, 2022 to $110 per share on October 19, 2022.

185. Later that day, analysts from Roth Capital Partners downgraded Generac from a "buy" to "sell" rating and slashed their price target for Generac by more than 75%. The analysts explained that "[m]anagement gave us a double whammy yesterday with its HSB business weak through mid-2023 and the clean energy business warranty expense/bad debt." As to solar, the analysts said "we believe the downside risk for the clean energy business could still be worse than expected." The analysts then summarized a webinar they had with Dan Javan, the CEO of Suntuity, which bills itself as "One of America's Largest Solar Integrators with Growing National Reach." The analysts wrote:

> In our recent Resi Solar Webinar #21 last Friday, Dan Javan, the CEO of Suntuity, highlighted that the problems persist. Dan said, 'This is still an ongoing issue. On the smaller fleet that we've got, we're averaging seven truck rolls on a fix for a GNRC [system] – Seven. I mean that is an extremely high number. Because they come up with solutions. We deploy the solution, the solution doesn't work. They come up with another firmware, you deploy the firmware, that doesn't work.' In a follow-up with us, Dan indicated that they are closer to five truck rolls now. We wonder if the $37mn warranty expense is enough as this could be an ongoing problem that could serve as a drag.

186. The analysts added that "some dealers are suggesting there may be a need for a national recall" and that Generac "may be compensating installer on average $750 per truck roll and each Snap RS may cost $15." Applying those estimates, the analysts noted:

> If we assume a typical system may need just two truck rolls instead of five, then at $750 per truck roll, the truck roll expense alone could be $1500 plus 20 Snap RS's

56

for an incremental $300 resulting in a total cost of ~$1800. With an estimate of total number of deployed GNRC PWRcell systems of ~30k or 240MW, this results in a total potential warranty expense of ~$54mn compared with the $37mn warranty expense from yesterday, suggesting there could be more warranty expense ahead. If the number of systems or number of truck rolls is higher than this, the expense could be much higher.

187. Also on October 19, 2022, analysts from Cowen slashed their price target for Generac by more than 20% and issued report stating that the preliminary results were "well below expectations." The analysts added, "[r]esidential sales were lower than expected." The same day, analysts from JP Morgan slashed their price target for Generac by more than 50%, citing the preliminary results that were "well below expectations" partially due to "one-time charges related to the bankruptcy of a material customer for the nascent clean power business."

188. The next day, October 20, 2022, analysts at BofA Securities called the results a "negative surprise" and commented on management's failure to be forthcoming, stating that, "[a]lthough likely one- time in nature, these [Pink Energy related] charges are worse than we previously expected, given [management's] limited comments around its exposure to issues with its clean energy products. Ultimately, net income comes in well below our prior expectations of $159 mn vs. $58 mn preliminarily reported."

189. Also on October 20, 2022, analysts from Morningstar cut their fair value estimate for Generac by nearly half. The analysts described the Pink Energy issues as "a setback in Generac's efforts to prove itself within the clean energy market" and noted that the "[w]eakness in home standby orders appears to be significantly lower than our prior expectations." Reflecting the view that management had not previously been candid, the analysts said, "we think investors should not rush to buy the weakness as we expect it to take time for management to re-establish credibility."

190. On November 2, 2022, Defendants Jagdfeld and Ragen held a conference call to discuss the Company's disappointing third quarter 2022 results. At the outset of the call, Defendant Jagdfeld further confirmed the negative impact of the SnapRS defect and Pink Energy over-consolidation on Generac, stating that the Company's residential sales "were weaker than expected in the quarter, driven by lower shipments of home standby generators and clean energy products relative to our prior expectations."

191. Regarding clean energy, Defendant Ragen disclosed that, "the loss of a major customer during the quarter, along with the specific warranty-related issue, has impacted near-term demand and our [sales] outlook for the full year 2022. He disclosed that the Company now expects clean energy to "deliver sales between $300 million to $330 million for the full year 2022, as compared to our previous guidance of approximately $500 million."

192. Defendant Jagdfeld further revealed the full scope and magnitude of the product defects and concentration of sales through Pink Energy and realization of the attendant risks as he attributed the lowered guidance to "the loss of a major customer during the quarter, along with the specific warranty-related issue" – *i.e.*, the defective SnapRS component, which led to Pink Energy's bankruptcy. He added:

> [S]hipments of PWRcell energy storage systems in the third quarter were negatively impacted by the significant liquidity challenges of a large customer that ceased operations and subsequently filed for bankruptcy. Additionally, during the quarter, we continued to address certain warranty-related matters for the upgrade of a component within our PWRcell energy storage system.

193. During the same November 2, 2022 earnings call, an analyst from William Blair stated that, "I think that energy storage business in '21 was around $220 million, $225 million" and "[i]t looks like the guidance that you're giving us now . . . implies that that's down something like 30% or so this year." The analyst asked, "[i]s that about right? And what is the overall market

growing and can you clarify . . . ." In response, Defendant Jagdfeld did not dispute the analysts'

estimates, and admitted that Generac had failed to build a diversified network of dealers, stating:

> Yes, market is still growing, although there's some mixed comments out there
> about the market growth. But yes, the loss of that major customer of ours in the
> second half of the year here, they really ceased operations in July. So we've got to
> do the hard work that, honestly, we should have been doing all along of continuing
> to expand our channel to more channel partners, but that hurts us definitely in the
> year, Brian. So yes, unfortunately, that's going to be down this year. Looking for
> that to return to growth next year, but as we kind of fill in with new customers, and
> we kind of reset, so '22 is going to end up being a reset year for us here on energy
> storage, which is disappointing, but I think -- and a rather painful learning lesson
> for us on just some of the trials and tribulations of that market, some of the
> customers and the dealer partners there, you're having to pick your partners
> carefully. Again, a lot of learning cycles we're going through there.

194.    An analyst later asked for clarification on the revenue reduction stemming from the

clean energy business, and whether that reduction was driven by Pink Energy's bankruptcy.

Defendant Jagdfeld answered: "Yes. The majority of the market is related to the loss of the

customer. It was a really important customer for us. And the diversification of our customer base

is going to be the primary focus here going forward."

195.    Another analyst asked for clarification on the "certain component needed to be

upgraded," and Defendant Jagdfeld responded: "It's a rooftop mounted shutoff device, and that

device is – the previous generation of that device, has a higher failure rate than what we'd like to

see," which, of course, was reportedly near 50%. Defendant Jagdfeld was forced to admit that the

Company was replacing the SnapRS as a result of the defect, stating: "So we're proactively

replacing those devices for customers so they don't see an interruption of the production of their

systems. . . . And that upgrade, the total effort there is what's reflected in that additional warranty

reserve charge that we took here in the quarter."

196.    On this news, Generac common stock fell again, from $115 per share on November

1, 2022 to $106 per share on November 2, 2022.

197. The next day, November 3, 2022, analysts at BofA Securities issued a report titled: "The Other Shoe (Clean Energy) Drops." The BofA analysts wrote that Generac's solar business "faces operational difficulties with ramping its PWRcell deployments, following product quality issues and a lost major customer." The analysts stated they were surprised by the November 2 disclosures, saying "we believe GNRC is facing greater challenges with its clean energy segment than we previously understood."

198. The same day, November 3, 2022 analysts at William Blair likewise commented that Generac's "dependence on distributor Pink Energy was more significant than we understood," adding: Management has consistently indicated Generac works with many distributors in the solar and energy storage market, and that Generac has trained and certified over 2,000 dealers on the company's solar/energy storage product portfolio. We believe it will come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales. Pink Energy filed for bankruptcy on October 7 and is no longer installing Generac products.[11]

199. In further describing the impact Pink Energy had on Generac's solar business, the William Blair analysts noted that Generac's updated clean energy guidance of $300 million to $330 million "include[d] ecobee, which we estimate will generate about $150 million in revenue 2022." Therefore, the analysts explained, the updated guidance "for the core clean energy business (primarily residential solar) is approximately $150 million to $180 million, down from about $225

---

[11] That Pink Energy accounted for more than half of Generac's solar revenue is further supported by the estimate from Roth Capital Partners that the "total number [of] deployed" PWRcell systems was "~30k." Pink Energy, in turn, had "19,000 customers with solar energy systems that utilized . . . the SnapRS"– i.e., 63% of the total PWRcell systems. Moreover, given that Generac had 2,000 solar installers in April 2021 versus 2,600 in May 2022, and that "SnapRS units . . . have been part of nearly every Pink Energy solar energy equipment installation since that 2020," the concentration of sales through Pink Energy was likely the same or even higher at the start of the Relevant Period.

million in 2021." They added that, "[a]lthough the year-over-year decline is substantial, the situation looks even worse after deriving the run rate for this business expected in the second half of 2022," explaining:

> If management was previously expecting clean energy revenue of $500 million in 2022, then the expectation was approximately $350 million excluding ecobee. We estimate the $350 million for the year included approximately $150 million in the first half of 2022. These estimates, and implied revenue guidance of $150 million to $180 million for core clean energy in 2022, indicate revenue in the second half of the year is expected to be less than $30 million.

200.    The William Blair analysts stated that "[t]he realization of customer concentration makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market, and recent quality issues will make building that distribution even more challenging." The analysts continued, "[t]hese realizations regarding clean energy hurt management's credibility, given there was no indication Generac had material customer concentration in this business," and "[w]e now also believe the quality issues Generac has been experiencing with solar components, particularly a rapid shutdown device called the SnapRS, are severe enough that the company's reputation in the solar industry has been damaged."

201.    Explaining just how widespread the product SnapRS defect had been, the William Blair analysts estimated that Generac may be in the process of replacing about 300,000 SnapRS devices in the field. They also commented on the magnitude of liabilities associated with the product defects by observing these replacements are extremely labor intensive and noted that Generac management publicly conveyed that replacement costs are "significantly weighted towards" labor, with hardware being the minority. They concluded: "We believe the valuation expansion driven by the solar business has essentially completely reversed."

202.    In total, from November 1, 2021, the day before the facts about Generac's true business state and prospects began to be partially revealed, to November 2, 2022, the price for

Generac's common stock fell an astonishing $400 per share, wiping out more than $25 billion of market capitalization.

203.　On November 22, 2022, the state Attorneys General of Kentucky, North Carolina, Illinois, Indiana, Michigan, Pennsylvania, South Carolina, Tennessee, and Virginia sent a joint letter to companies that provided financing for consumer purchases of solar power systems from Pink Energy. The letter asks for a suspension of repayments for non-working systems.

204.　The Individual Defendants' misconduct has significantly harmed Generac. As a result of this misconduct, the Company is now the target of the sustained Consumer Action, as well as the Securities Action which alleges violations of federal securities laws and is brought on behalf of a "class" of persons and entities that purchased or otherwise acquired Generac common stock during the Relevant Period.

205.　The Eastern District of Wisconsin denied Generac's motion to dismiss in the Consumer Action on May 24, 2024. On July 5, 2024, Generac filed an answer to the operative complaint in the Consumer Action, and the case is headed towards trial.

206.　The Securities Action is currently awaiting a decision from the Eastern District of Wisconsin regarding defendants' motion to dismiss.

## I.　Insider Sales

207.　The Individual Defendants had a massive informational advantage and were uniquely situated to gain enormous financial rewards by capitalizing on the skyrocketing stock price based on the prospects associated with Generac's solar products. By positively portraying the Company in a positive light during the Relevant Period, and based on Individual Defendants' Relevant Period statements, Generac's stock increased from around $340 per share at the start of the Relevant Period to $400 per share by June 2021 and $500 per share in October 2021.

208.    During the Relevant Period, when Generac stock was trading at artificially inflated prices, Defendant Jagdfeld engaged in multiple rounds of stock selloffs. During this time, Defendant Jagdfeld sold nearly 125,000 shares of Generac stock, including at prices reaching $500 per share, for more than $38 million in gross insider sale proceeds. All of Defendant Jagdfeld's insider sales occurred at prices far greater than the $106 price the shares had fallen to at the end of the Relevant Period.

209.    Likewise, on November 11, 2021, Defendant Ragen sold off 10,000 shares at more than $440 per share, for more than $4.4 million in gross insider sales proceeds.

210.    Moreover, Generac's executive compensation plan was tied directly to increasing the Company's stock price and executing Generac's "Powering Our Future Strategy." For example, in discussing Generac's executive compensation for 2021 and 2022, Generac's Proxy Statements filed with the SEC on April 29, 2022 and April 28, 2023, stated that the Individual Defendants could receive "annual and long-term incentive opportunities" in the form of annual cash bonuses and stock options. Specifically, Generac's annual bonus plan awards bonuses based on, in part, "achievement of Generac's annual financial goals . . . and other qualitative and quantitative performance objectives." Likewise, Generac's stock option program awards equity based on, in part, "creating stockholder value over the long-term." In other words, the Individual Defendants' annual cash awards and equity offerings increased based on driving the stock price up and delivering on the Company's key initiatives, including continued execution of its core HSB business and growing its solar business.

211.    Under these compensation plans, Defendant Jagdfeld received $7.5 million and $6.8 million in total compensation for 2021 and 2022, respectively, and Defendant Ragen received $1.9 million and $1.8 million in total compensation for 2021 and 2022, respectively. Thus, the

Individual Defendants had significant incentive to conceal the SnapRS defect particularly since the solar business is critical to Generac's future.

212. Having successfully raised the Company's share price to record highs, in 2021, Defendants Ragen and Jagdfeld began to sell their Generac common stock. During the Relevant period, these insiders reaped large profits selling shares of the Company's common stock at market prices that were inflated by Individual Defendants' positive misstatements and omissions.

213. Specifically, during the Relevant period, Defendants Jagdfeld and Ragen collectively sold over 130,000 shares of Generac common stock and reaped over $40 million in total gross proceeds.

214. These insider transactions in the Company's common stock during the Relevant Period, and the resulting proceeds and profits, are set forth below:

**Defendant Jagdfeld's Insider Transactions**:

| Date | Shares Sold | Price | Profit |
|------|-------------|-------|--------|
| May 3, 2021 | 1101 | $325.7361 | $358,635.45 |
| | 1182 | $322.4043 | $381,081.88 |
| | 1212 | $323.3704 | $391,924.92 |
| | 1505 | $324.383 | $488,196.42 |
| June 1, 2021 | 400 | $333.245 | $133,298.00 |
| | 457 | $332.1418 | $151,788.80 |
| | 544 | $329.0362 | $178,995.69 |
| | 935 | $330.2798 | $308,811.61 |
| | 2664 | $331.4516 | $882,987.06 |
| July 1, 2021 | 1325 | $413.044 | $547,283.30 |
| | 1493 | $412.3671 | $615,664.08 |
| | 2182 | $414.0182 | $903,387.71 |
| August 2, 2021 | 100 | $418.01 | $41,801.00 |
| | 200 | $415.55 | $83,110.00 |
| | 300 | $414.0889 | $124,226.67 |
| | 393 | $419.3444 | $164,802.35 |
| | 700 | $412.90 | $289,030.00 |
| | 700 | $411.9036 | $288,332.52 |
| | 900 | $416.46 | $374,816.34 |
| | 1707 | $421.3186 | $719,190.85 |

| | | | |
|---|---|---|---|
| September 1, 2021 | 510 | $439.39 | $224,088.90 |
| | 985 | $437.89 | $431,321.65 |
| | 1590 | $440.43 | $700,283.70 |
| | 1915 | $436.73 | $836,337.95 |
| October 1, 2021 | 100 | $406.90 | $40,690.00 |
| | 300 | $408.67 | $122,601.00 |
| | 300 | $404.59 | $121,377.00 |
| | 577 | $403.00 | $232,531.00 |
| | 1227 | $402.35 | $493,683.45 |
| | 2496 | $401.35 | $1,001,769.60 |
| November 1, 2021 | 400 | $496.85 | $198,740.00 |
| | 500 | $498.14 | $249,070.00 |
| | 709 | $500.01 | $354,507.09 |
| | 1091 | $499.11 | $544,529.01 |
| | 1150 | $495.21 | $569,491.50 |
| | 1150 | $494.28 | $568,422.00 |
| December 1, 2021 | 100 | $427.22 | $42,722.00 |
| | 300 | $425.67 | $127,701.00 |
| | 516 | $422.13 | $217,819.08 |
| | 585 | $419.24 | $245,255.40 |
| | 670 | $421.20 | $282,204.00 |
| | 947 | $424.32 | $401,831.04 |
| | 1882 | $423.42 | $796,876.44 |
| January 3, 2022 | 198 | $349.90 | $69,280.20 |
| | 214 | $346.43 | $74,136.02 |
| | 274 | $350.86 | $96,135.64 |
| | 282 | $351.94 | $99,247.08 |
| | 316 | $348.49 | $110,122.84 |
| | 465 | $344.57 | $160,225.05 |
| | 484 | $347.49 | $168,185.16 |
| | 521 | $345.93 | $180,229.53 |
| | 2246 | $353.93 | $794,926.78 |
| February 1, 2022 | 2192 | $282.96 | $620,248.32 |
| | 2802 | $284.05 | $795,908.10 |
| | 3232 | $280.08 | $905,218.56 |
| | 5000 | $286.29 | $1,431,450.00 |
| | 10615 | $281.16 | $2,984,513.40 |
| | 11053 | $282.16 | $3,118,714.48 |
| March 1, 2022 | 5000 | $314.49 | $1,572,450.00 |
| April 1, 2022 | 5000 | $298.74 | $1,493,700.00 |
| May 2, 2022 | 5000 | $218.70 | $1,093,500.00 |
| June 1, 2022 | 5000 | $250.68 | $1,253,400.00 |
| July 1, 2022 | 5000 | $213.81 | $1,069,050.00 |

| August 1, 2022 | 5000 | $264.96 | $1,324,800.00 |
| September 1, 2022 | 5000 | $216.36 | $1,081,800.00 |
| October 3, 2022 | 5000 | $179.90 | $899,500.00 |
| November 1, 2022 | 5000 | $119.05 | $595,250.00 |

| | |
|---|---|
| **Total Shares Sold** | **124,894** |
| **Gross Sale Proceeds** | **$38,223,208.62** |

**Defendant Ragen's Insider Transactions**:

| Date | Shares Sold | Price | Profit |
|---|---|---|---|
| | 991 | $441.38 | $437,407.58 |
| November 11, 2021 | 2328 | $443.27 | $1,031,932.56 |
| | 6681 | $442.59 | $2,956,943.79 |

| | |
|---|---|
| **Total Shares Sold** | **10,000** |
| **Gross Sale Proceeds** | **$4,426,283.93** |

215. Defendants Ragen's and Jagdfeld's insider sales were made with knowledge of MNPI before the material misstatements and omissions were revealed.

**J.      Plaintiffs Send the Board the Litigation Demand in July 2023**

216. On July 18, 2023, Plaintiffs, through counsel, sent the Litigation Demand to the Board under Delaware law, contending that the Board must:

> (1) investigate, address, and promptly remedy the harm inflicted upon Generac as a result of the misconduct described herein; and (2) commence legal proceedings against each individual identified as being responsible for the mismanagement and other related misconduct as described herein.

217. The Litigation Demand outlined alleged misstatements and omissions made to stockholders during the Relevant Period, detailed therein.

218. Further, Plaintiffs demanded that that the Board implement the following measures (including bringing all appropriate legal action to enforce any such measures) to redress the wrongs complained of in the Litigation Demand:

(1) the Board should require all persons found to have breached their fiduciary duties to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, including any insider sales of Generac stock;

(2) the Board should require all persons found to have breached their fiduciary duties to return to Generac all salaries, bonuses, severance, and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of fiduciary duties they owed to Generac;

(3) the Board should require all persons found to have breached their fiduciary duties to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct;

(4) the Board shall terminate, for cause, any Company employee responsible for the wrongdoing discussed herein and, to the extent a director is found to have engaged in wrongdoing, such director shall immediately be removed from the Board for cause; and

(5) the Board should adopt new, robust corporate governance policies and procedures to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future.

219.    On August 22, 2023, counsel for the Company confirmed receipt of the Litigation Demand and asked Plaintiffs' counsel to provide certain documentation regarding Plaintiffs' holdings in Generac.

220.    On August 29, 2023, although they were under no legal obligation to do so in connection with the Litigation Demand, Plaintiffs, through counsel, promptly provided the documentation that Generac's counsel requested.

221.    By letter/e-mail communication dated September 1, 2023, counsel for the Company informed Plaintiffs that the Board intended to consider the Litigation Demand at its next meeting.

222.    On October 16, 2023, by letter/e-mail communication, Plaintiffs' counsel reached out to the Company's counsel for an update regarding the Litigation Demand.

223. On October 18, 2023, counsel for the Company informed Plaintiffs that the Board formed a so-called "Demand Review Committee" and that the DRC was in the process of retaining counsel.

224. By letter/e-mail communication, on December 12, 2023 and again on January 19, 2024, Plaintiffs' counsel requested updates regarding the DRC's consideration of the Litigation Demand.

225. On February 15, 2024, DRC's counsel informed Plaintiff's counsel of the membership of the DRC counsel, which included Defendants Avedon, Dixon, Lampereur, and Morgan. Notably, all the DRC members signed the materially false and misleading 2021 10-K and 2022 Proxy as alleged herein.

226. By letter/e-mail communication, on March 6, 2024 and on May 6, 2024 Plaintiffs' counsel once again requested an update regarding the Litigation Demand from the DRC's counsel.

227. On November 6, 2024, Plaintiff's counsel again requested an update regarding the Litigation Demand from the DRC's counsel. By email, on November 8, 2024, DRC's counsel responded and noted that the DRC was "continuing to monitor the securities litigation."

228. To date, the DRC has not delivered an adequate update regarding the Litigation Demand.

229. As discussed above, the Securities Action is currently awaiting an order on the pending motion to dismiss, and it has been ***nearly seventeen months*** since the Litigation Demand was sent to the Board. It has also been months since the Consumer Action survived a motion to dismiss, yet the Board has undertaken none of the items demanded in the Litigation Demand, including an independent investigation in good faith.

230.     It is clear that the Board intends to never consider the Litigation Demand, while instead burying its head in the sand and hoping that Plaintiffs will just sit idle while the Individual Defendants escape liability for their wrongdoing.

231.     The only possible basis for the Board's indefinite deferral of the Litigation Demand is that the Board has determined to reject the Litigation Demand from the outset in bad faith and in breach of its fiduciary duties.  Because the Board has constructively, wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused Generac.

## VI.     DAMAGES TO GENERAC

232.     Generac has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

233.     As a direct and proximate result of the Individual Defendants' conduct, Generac has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a.     legal fees associated with the lawsuits filed against Generac and its officers and directors for violations of the federal securities laws and applicable consumer laws;

b.     loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

c.     amounts paid to outside lawyers, accountants, and investigators in connection with any investigations; and

d.     loss of revenues and profits.

69

## VII. DEMAND REFUSAL ALLEGATIONS

234.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

235.     Plaintiffs are current stockholders of the Company, were stockholders of the Company at the time of the Individual Defendants' wrongdoing as alleged herein, and have continuously been stockholders of the Company since May 17, 2021 (Plaintiff Surprenant) and January 26, 2022 (Plaintiff Levy).

236.     Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

237.     On July 18, 2023, the Litigation Demand was served to the Board, to independently investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries and others responsible for damaging Generac.

238.     Upon receiving the Litigation Demand, the Board and its DRC had an affirmative duty under Delaware law to promptly conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand and to reach a good faith, reasonable, and objective conclusion regarding the potential claims detailed in the Litigation Demand.

239.     However, to date, the Board and DRC have refused to undertake any of the actions detailed in the Litigation Demand in indefinite deference to other litigation.

240.     The only possible conclusion is that the Board acted in bad faith and in breach of its fiduciary duties in refusing to investigate and consider the Litigation Demand, and in fact has intended to reject the Litigation Demand from the outset.

241.     Because the Board has constructively and wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company, rectify

70

the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused Generac.

242. Prosecution of this action, independent of the current Board, is in the best interest of the Company.

243. The wrongful acts complained of herein subject, and will continue to subject, Generac to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

244. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

245. The Individual Defendants, as current or former Generac officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

246. By virtue of their positions as Generac directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

247. Each Individual Defendant was required to: (a) use his or her ability to control and manage Generac in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Generac rather than his or her own interests.

248. By their acts alleged herein, including but not limited to causing Generac to issue false and misleading statements while concealing material adverse information and failing to

ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

249. The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

250. Generac has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT II

### Breach of Fiduciary Duty Against the Officer Defendants

251. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

252. The Officer Defendants owed Generac and its shareholders the highest obligations of due care and loyalty in the administration of the affairs of the Company, including, without limitation, operating the Company in compliance with federal securities laws and reporting significant risks to the Board and shareholders.

253. The Officer Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

254. As a direct and proximate result of the Officer Defendants' conscious and/or grossly negligent failure to perform their fiduciary duties, Generac has sustained significant damage.

255. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

## COUNT III

### Breach of Fiduciary Duty Against the Demand Defendants

256.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

257.    The Demand Defendants acted unreasonably and in bad faith by constructively, wrongfully refusing the Litigation Demand.

258.    As a direct and proximate result of the breaches of duty alleged herein, Generac has sustained and will sustain significant damages.

259.    As a result of the misconduct alleged herein, the Demand Defendants are liable to the Company.

260.    Plaintiffs, on behalf of Generac, have no adequate remedy at law.

## COUNT IV

### Against Defendants Jagdfeld and Ragen for Breach of Fiduciary Duty (*Brophy*)

261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

262.    Defendants Jagdfeld and Ragen are each a fiduciary of Generac, possessed MNPI of Generac, and used that information improperly to profit from a sale of Generac stock. When Defendants Jagdfeld and Ragen directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the MNPI they possessed.

263.    When Defendants Jagdfeld and Ragen sold their stock, they knew that the investing public was unaware of the negative MNPI that they possessed.  They also knew that if the information was disclosed, the market price of Generac would be significantly lower. Defendants Jagdfeld and Ragen timed their stock sales to take advantage of the public's ignorance of the

concealed facts and obtain a higher price for the stock he sold. They thereby benefited by misappropriating Generac's MNPI.

264.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT V

### Unjust Enrichment Against the Individual Defendants

265.    Plaintiffs incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

266.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Generac.

267.    Plaintiffs, as stockholders and representatives of Generac, seek restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all Individual Defendants, Demand Defendants, and Officer Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the aforementioned Individual Defendants' breaches of fiduciary duties;

B.    Directing Generac to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.    Awarding to Generac restitution from the Individual Defendants, Demand Defendants and Officer Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the aforementioned Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

Dated: December 11, 2024    By: */s/ Samuel J. Adams*

**POMERANTZ LLP**
Gustavo F. Bruckner (Bar No. 2540581)
Samuel J. Adams (Bar No. 4872909)
Ankita Sangwan (*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Email: gfbruckner@pomlaw.com
       sjadams@pomlaw.com
       asangwan@pomlaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn (*pro hac vice* application forthcoming)
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker (*pro hac vice* application forthcoming)
326 W. Lancaster Avenue
Ardmore, PA 19003

Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: brett@shumanlawfirm.com

*Attorneys for Plaintiffs*